[No. B215310. Second Dist., Div. One. Aug. 9, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
CHRISTOPHER ANTHONY HALL, Defendant and Appellant.

**COUNSEL**

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jaime L. Fuster and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—On June 18, 2005, Christopher Anthony Hall fled police in a vehicle pursuit which resulted in the deaths of Lillian Arrevalo, and 16-year-old Brian McWright. A jury convicted appellant Hall of multiple counts, including second degree murder, assault upon a peace officer, and driving under the influence causing injury. Hall contends the trial court committed reversible error by (1) admitting testimony regarding the blood-alcohol level of a blood sample over his chain of custody objection, and (2) denying his motion for a new trial based on newly discovered evidence. We affirm.

## FACTUAL BACKGROUND

*Prosecution Case*

### 1. *Incidents Prior to the Pursuit*

On June 17, 2005, or on June 18, 2005, Hall entered a store, grabbed two cases of beer and a bottle of rum, and left without paying.[1] The store owner followed him and saw Hall enter a large motor home and drive off.

On June 18, 2005, about 1:00 p.m., California Highway Patrol Officer Jerry Nelson responded to a traffic collision. Officer Nelson arrived at the location and found Hall and his wife, Michelle Hall, standing next to a damaged El Camino. When Officer Nelson asked if anyone was injured, Hall and his

---

[1] The parties dispute the date of this event. Whether this event happened on June 17 or June 18 is not relevant for purposes of our disposition.

wife stated they had no injuries. Hall had a strong odor of alcohol and was unsteady on his feet. With slurred speech, Hall admitted to Officer Nelson that he had been drinking alcohol that day. Hall appeared fully conscious and answered Officer Nelson's questions appropriately. Hall and Michelle told Officer Nelson that Michelle had been driving the El Camino. Since the El Camino could not be driven, Officer Nelson called for a tow truck over Hall's objections. Eventually, the tow truck arrived and took the car along with Hall and his wife.

### 2. *The Police Pursuit*

That same day, about 4:00 p.m., Hall was driving a motor home and cut off two cars that were leaving a gas station, forcing the drivers to slam on their brakes in order to avoid colliding with the motor home. Hall continued driving about 50 miles per hour in the far right lane and suddenly swerved into the left lane, clipping the left bumper of a car driven by Lillian Arrevalo. Arrevalo's car crashed into a light pole; Arrevalo was killed. Shortly after striking Arrevalo's car, Hall pushed a truck out of a left turn lane and struck the rear side of another car. Sometime after the collisions, Deputy Sheriff Brian Hickey activated the lights and siren of his marked patrol car and began pursuit of the motor home. Hall did not stop and drove through numerous intersections with stop signs.

At one point, Hall pulled over to the shoulder of the road. Deputy Hickey got out of his car, drew his weapon, and ordered Hall to exit the motor home. About 30 seconds later, Hall drove away and Deputy Hickey continued pursuit. A short time later, Hall stopped again and Deputy Hickey observed "what appeared to [be] banging" on the driver's side door "like somebody was trying to get out." Once more, Hall drove off but then stopped. The driver's side door flew open and Hall's wife got out of the motor home. At this time, Deputy Hickey said over the PA system: "it's not worth anybody else getting hurt. Just stop the motor home." Hall made eye contact with Deputy Hickey, yelled, "fuck you, fuck you, fuck you" and drove away.

After driving for about a mile, Hall stopped in the middle of the road. Five or six marked sheriff's patrol cars had been pursuing Hall and also stopped across the two-lane road. About a minute later, Hall made a U-turn and accelerated toward the deputies. The deputies ran to their cars for cover. Hall swerved the motor home to squeeze through an eight- to 10-foot gap between the patrol cars but did not strike the deputies or their cars. The deputies continued pursuit. At one point, a marked patrol car carrying three deputies

was caught in front of the motor home and made a fast right turn to avoid being struck by the motor home.

The motor home remained in the southbound lane of the road but repeatedly straddled the lane. As the pursuit continued, deputies reached an average speed of 90 miles per hour. At the upcoming intersection, a deputy sheriff attempted to clear the intersection because the motor home was approaching. Without slowing down or attempting to avoid the stopped vehicles, Hall entered the intersection and rear-ended a green car. The motor home continued on, hitting the side of a patrol car. Eventually, the motor home hit a small car, flipped on its side and slid to a stop on the asphalt.

Four people were in the green car; three of them escaped the collision relatively unscathed. The fourth, 16-year-old Brian McWright was trapped in the car and personnel had to remove the roof in order to extricate him. McWright later died from injuries suffered in the collision.

### 3. *Hall's Arrest and Statements*

Deputies arrested Hall and placed him in the backseat of a patrol car. Without inquiry from the deputies, Hall spontaneously stated: "I'm sorry sir. I know I killed that lady on 47th Street. I fucked up. That's why I was running." He cried uncontrollably and repeatedly said he was sorry. Some-time later, Deputy Sheriff Thomas Bruner arrived at the scene and told Hall he was being taken to the hospital to have his blood drawn and then to the jail to be booked. Hall did not want to be moved and became agitated and uncooperative.

Subsequently, Hall told Deputy Bruner that his wife had been driving the motor home but then admitted he was driving when the collisions occurred.[2] Hall also told Deputy Bruner that he drank five Budweiser beers earlier in the day and that he was "tanked." Deputy Bruner noticed the smell of alcohol emitting from Hall. Hall further stated that he was HIV positive and that he had last eaten "two weeks ago" because he had not been hungry. Hall also said that he had not suffered any head injuries.

---

[2] After Hall's statement, Deputy Bruner read the *Miranda* warnings to Hall. (*Miranda v. Arizona* (1966) 384 U.S. 436, 478–479 [16 L.Ed.2d 694, 86 S.Ct. 1602, 1630].) Hall declared he understood his rights and wanted to talk to Deputy Bruner.

### 4. *The Hospital*

Deputy Bruner and his partner took Hall to the hospital to ensure he was "O.K. to book" and to have his blood drawn.[3] Despite being told he was going to be booked for murder, Hall was nonchalant. While in the hospital, Hall was irritable and agitated with the way the hospital staff treated him and with the fact that the deputies had handcuffed him to a chair. Medical personnel evaluated Hall and made him sign paperwork for the release of his blood. At trial, Deputy Bruner testified that blood was drawn from Hall; an entry on an evidence envelope reflects that the blood was drawn at 6:15 p.m.

### 5. *Investigation and Suicide Attempt*

About 7:30 p.m., deputies *"Mirandized"* and interviewed Hall. When asked about the collisions, Hall stated he could not remember anything because of the bump on his head. When asked why he did not pull over, Hall answered that he was afraid because the deputies were pointing guns at him. Hall admitted drinking three beers during the day. The next day, June 19, 2005, while in the Inmate Reception Center, Hall wrapped a sheet around his neck and tied the sheet to the railing of the second floor. Hall then leaped over the railing but deputies were able to foil the suicide attempt and took him to see a nurse. Hall denied ever receiving mental health treatment.

On June 21, 2005, deputies *"Mirandized"* and interviewed Hall again. Again, Hall told the deputies he could not remember the events of June 18, 2005. Hall said he had previously been arrested twice for driving under the influence and knew the consequences of drinking and driving. A subsequent search of the motor home revealed two unopened cases of beer and an opened bottle of rum. About a cup of rum was missing from the bottle.

*Defense Case*

Hall testified in his own defense: Hall could only remember some of the June 18, 2005 incidents. Hall stated that he was driving when the El Camino collision occurred and his head hit the car's left side window and windshield. Hall remembered everything before June 18, 2005, but had a limited recollection of the two weeks following the El Camino collision.

At trial, Hall remembered drinking three beers and about two shots of whisky the morning of June 18, 2005. Hall also remembered sitting in a chair with a doctor kneeling in front of him. He recalled telling the doctor, "You

---

[3] "O.K. to book" indicates the arrestee does not have injuries that would preclude his being booked into jail.

can hit a vein back here. You can draw blood back here." He further remembered that he had attempted to kill himself because he "couldn't handle" the fact that he had killed two people, one being a child. Hall also testified that he was not HIV positive and that he had been eating in the days prior to June 18, 2005. Hall did not know why he told the deputies otherwise. On cross-examination, Hall testified that he had never hallucinated. He stated that he told a psychologist about Penelope, a spirit girl whom he saw a couple of times in about 1988 and had not seen since then. He maintained she was real and not a hallucination.

After reviewing an MRI of Hall's brain, a radiologist declared that a portion of Hall's left frontal lobe was missing. The brain damage was a result of a 1985 car accident. A neuropsychologist, Dr. Marcel Ponton, testified that as a result of hitting his head in the El Camino collision, Hall suffered a concussion and likely had bleeding in the brain. Dr. Ponton explained that Hall's lack of judgment, irritability, erratic behavior, slurred speech, followed by a period of two weeks of memory loss were consistent with a concussion and permanent brain damage. Therefore, according to Dr. Ponton, Hall was in an altered state of consciousness when driving the motor home.

*Prosecution's Rebuttal*

Dr. Gordon Plotkin, a psychiatrist, opined that Hall's altered mental status was due to alcohol intoxication. Dr. Plotkin testified that Hall's medical records failed to show Hall suffered a concussion and he suggested that Hall was lying about remembering the events in order to avoid a conviction. Furthermore, Dr. Plotkin testified that Hall previously lied to mental health experts about having a hallucination involving Penelope in order to obtain secondary gain. Dr. Plotkin also testified that Hall had done something similar in order to obtain narcotics from different medical facilities.

Dr. Plotkin further testified that Hall was acting with volition at the time of the crimes because Hall allowed his wife to get out of the motor home and purposely swerved the motor home in order to avoid hitting the patrol cars when he made the U-turn. In addition, Dr. Plotkin stated that if Hall had amnesia, he would not have been able to create memories. Therefore, Hall would not have said, "I'm sorry sir. I know I killed that lady on 47th Street. I fucked up. That's why I was running." On cross-examination, defense counsel asked Dr. Plotkin, "Do you recall saying to me, 'I should have gotten to you first'?" Dr. Plotkin answered in the affirmative.

*Hall's Surrebuttal*

Hall testified that Penelope was real and not a hallucination. Hall also denied telling Dr. Plotkin that he tried to get secondary gain by making false claims to medical providers.

## PROCEDURAL BACKGROUND

The jury found Hall guilty of two counts of second degree murder (Pen. Code,[4] § 187, subd. (a)), six counts of assault upon a peace officer (§ 245, subd. (c)), three counts of assault with a deadly weapon (§ 245, subd. (a)(1)), one count of evading an officer with willful disregard (Veh. Code, § 2800.3), and one count of driving under the influence causing injury (Veh. Code, § 23153, subd. (a)).[5] The jury also found Hall was legally sane at the time he committed the crimes. Hall moved for a new trial based on newly discovered evidence. The motion was denied.

## DISCUSSION

### 1. *Chain of Custody Claim*

Hall contends the trial court should have excluded testimony regarding the blood-alcohol level of Hall's blood sample because its chain of custody was inadequate. Hall claims that reversal is required because the admission of the testimony was so prejudicial as to render his trial fundamentally unfair. The Attorney General maintains that Hall has forfeited his objection to the chain of custody regarding the blood sample and that, even if there was no forfeiture, the chain of custody was adequate and the trial court properly admitted the evidence.

We find that Hall did not forfeit his objection to the chain of custody. We also find, however, Hall's assertion of error lacks merit.

### a. *Relevant trial proceedings*

At trial, criminalist Catherine Navetta stated her background and testified as to the following blood collection procedure: The crime lab gives officers a blood collection kit. Whenever a person is arrested for driving while intoxicated, the officers take the individual to a medical facility where a phlebotomist draws the blood. The blood collection kit includes a blood tube, instructions, and an evidence envelope. The officers are trained to invert the

---

[4] All statutory references are to the Penal Code unless otherwise specified.

[5] At the close of the prosecution's case-in-chief, the trial court dismissed one count of unlawful driving or taking of a vehicle (Veh. Code, § 10851) and the prosecution dismissed one count of evading an officer causing injury and two counts of hit-and-run driving (Veh. Code, §§ 2800.2, subd. (a), 20002, subd. (a)). The jury found Hall not guilty of two counts of attempted murder (§§ 664, 187, subd. (a)). Hall was sentenced to a total of 47 years to life in prison.

blood tube to prevent clotting. Once the blood has been drawn, an officer writes his initials and the subject's name on the blood tube and places it in the evidence envelope. The officer then fills out some information on the evidence envelope and either the officer or the phlebotomist writes the date and time the blood sample was collected. The evidence envelope is sealed and submitted to the crime lab.

During the criminalist's testimony regarding the collection procedure, defense counsel asked to approach the bench. Defense counsel stated that Deputy Bruner had not previously testified "about any foundational stuff as to what procedures were followed" when the blood sample was drawn from Hall and that there was "no foundation for chain of custody." The trial court asked the prosecution for an offer of proof and concluded, "I think that the chain of custody issues go to weight, not admissibility. And if [in]deed he took him for the purpose of having the blood drawn, she's on the other side saying, 'this is what I got on the date in question.' [¶] . . . [¶] Then she is going to talk about her exam." The trial court ruled that it would allow the testimony "so far" and would "hear later arguments as to whether some of [it was] going to be stricken, but [thought it was] okay."

The criminalist testified that on June 21, 2010, the Antelope Valley crime lab received the blood sample in an evidence envelope with a case number. Once in custody of the crime lab, the blood sample was assigned a lab number, J616767. The criminalist further testified that the Downey lab received a lab receipt with Hall's full name and the case and lab numbers along with the evidence envelope which bore Hall's full name, the date and time the blood was drawn, the name of the hospital where the blood was drawn, the name of the person who took the blood, as well as an illegible signature of the arresting officer. The criminalist indicated that the signature started with the letter "B" and that the blood was drawn on June 18, 2005, at 6:15 p.m.

After explaining the blood analysis procedure, the criminalist explained that on June 27, 2005, she opened the sealed evidence envelope that bore Hall's information, analyzed the blood sample in the unopened tube inside the evidence envelope, and found that the sample had a blood-alcohol level of 0.15 percent. Based on the results of the test, the criminalist opined, "A person at .15 would definitely be impaired to drive safely."

On cross-examination, defense counsel inquired as to the whereabouts of the blood sample during the three days before the crime lab received it and the six days following the crime lab's receipt of the blood sample. The

criminalist did not know. However, based on her knowledge of procedure followed by the crime labs, she opined that the blood sample was transported from Antelope Valley to the Beverly lab and later arrived at the Downey lab. Once at the Downey lab, the blood sample was stored in the evidence control section.

> b. *There was no forfeiture of the chain of custody claim on appeal*

The Attorney General contends that Hall has forfeited the chain of custody claim because Hall's defense counsel failed to renew the objection to the criminalist's testimony. We disagree.

■ In order to preserve a claim on appeal, not only must the objection to the evidence appear on the record, but also the objection must have been timely made and stated in a way as to make clear the specific ground of the objection. (Evid. Code, § 353.) We find that Hall's objection met these requirements. The record shows Hall timely objected to the criminalist's testimony after she began testifying to the blood collection procedures. He objected on grounds of inadequate foundation for the chain of custody of the blood sample. He specifically noted there was no evidence to show that Hall's blood had been collected and no evidence to show what procedures were actually followed.

■ Once an objection has been fully considered and overruled, it is not necessary to repetitiously renew the objection in the same trial to preserve the issue on appeal. (See *People v. Clark* (1990) 50 Cal.3d 583, 623 [268 Cal.Rptr. 399, 789 P.2d 127]; see also *People v. Scott* (1978) 21 Cal.3d 284, 291 [145 Cal.Rptr. 876, 578 P.2d 123].) Here, Hall's objection was fully considered and overruled. The trial court found the chain of custody to be adequate because Deputy Bruner "took [Hall to the hospital] for the purpose of having the blood drawn, [and the criminalist was] on the other side saying, 'this is what I got on the date in question.' " The trial court explained that any chain of custody issues go to weight, not to admissibility and stated, "I'll allow this testimony so far. I'll hear later arguments as to whether some of this is going to be stricken, but I think it's okay." Since Hall's objection was analyzed and overruled during the criminalist's testimony, Hall was not required to renew the objection at a later time. The Attorney General concedes that even if Hall had made further objections to the chain of custody, those objections would have been overruled for similar reasons.

The Attorney General cites *People v. Holloway* (2004) 33 Cal.4th 96 [14 Cal.Rptr.3d 212, 91 P.3d 164] (*Holloway*), and *People v. Morris* (1991) 53

Cal.3d 152 [279 Cal.Rptr. 720, 807 P.2d 949] (*Morris*), both disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, footnote 1 [38 Cal.Rptr.2d 394, 889 P.2d 588], for the proposition that a party who fails to renew an objection to testimony at the time the witness is called to testify forfeits any objection. The Attorney General's reliance on *Morris* and *Holloway* is misplaced.

*Morris* and *Holloway* share a similar procedural background: the trial court denied the defendant's motion in limine to exclude relevant testimony and at trial, the defendant failed to object to the testimony. (*Holloway, supra*, 33 Cal.4th at p. 133; *Morris, supra*, 53 Cal.3d at p. 187.) In *Morris*, the California Supreme Court held that a subsequent objection at trial is not necessary when the motion in limine meets the basic requirements of Evidence Code section 353. (53 Cal.3d at p. 190.) The *Holloway* court, relying on *Morris*, concluded that "[a] tentative pretrial evidentiary ruling, made without fully knowing what the trial evidence would show, will not preserve the issue for appeal if the appellant could have, but did not, renew the objection or offer of proof and press for a final ruling in the changed context of the trial evidence itself." (*Holloway, supra*, 33 Cal.4th 96, 133.)

We find the principles announced in *Morris* and *Holloway* apply in limited situations when a defendant raises an objection in a pretrial or in limine context, but then fails to renew the objection during trial. Thus, the *Morris* and *Holloway* guidelines are not controlling here because Hall objected to the criminalist's testimony during her testimony at trial.

Even if the *Morris* and *Holloway* holdings were controlling here, Hall's objection was adequate. Hall's objection, as discussed above, complied with Evidence Code section 353 requirements. The objection was timely and made clear its specific ground. Moreover, the trial court was aware of what the evidence would show and provided a final ruling. Having summarized the prosecution's offer of proof, the trial court specifically noted that the "chain of custody issues go to weight, not admissibility" and allowed the testimony. Although the trial court stated, "I'll hear later arguments as to whether some of this is going to be stricken . . . ," the trial court did not impose a requirement that Hall renew his objection once the criminalist testified as to Hall's blood sample. Since the trial court had already overruled Hall's objection based on chain of custody, it appears from the record that this statement affirmed Hall's ability to object to the testimony on other grounds.

We conclude Hall was not required to renew his objection, and therefore his single objection to the criminalist's testimony preserved the blood sample's chain of custody claim on appeal.[6]

### c. *The chain of custody was adequate*

Hall asserts the trial court committed reversible error when it allowed a criminalist to testify that appellant had a blood-alcohol level of 0.15 percent over Hall's objection on chain of custody grounds. We disagree.

We review a trial court's exercise of discretion in admitting evidence over a chain of custody objection for abuse of discretion. (*People v. Catlin* (2001) 26 Cal.4th 81, 134 [109 Cal.Rptr.2d 31, 26 P.3d 357].) A chain of custody is adequate when the party offering the evidence shows to the satisfaction of the trial court that, " ' "taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration." ' " (*Ibid.*) The reasonable certainty requirement is not met when some " ' "vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence." ' " (*Ibid.*) However, when there is only the barest speculation that the evidence was altered, " ' "it is proper to admit the evidence and let what doubt remains go to its weight." ' " (*Ibid.*)

Hall argues that vital links in the blood sample's chain of custody were missing and therefore it is as likely as not that the blood sample the criminalist analyzed was not his blood. Hall notes there was no evidence to show who took Hall's blood sample, who delivered the blood sample to the crime lab, and how the blood sample was transported from the Antelope Valley crime lab to the Downey crime lab. He also points out that the criminalist was unable to testify as to the whereabouts of the blood sample during the three days before the crime lab received it and the six days following the crime lab's receipt of the blood sample. Hall relies on *People v. Jimenez* (2008) 165 Cal.App.4th 75 [80 Cal.Rptr.3d 579] (*Jimenez*) to support his argument that the chain of custody is inadequate.

The defendant in *Jimenez* was convicted of robbing a bank, and the issue on appeal was whether the trial court erred when it admitted a DNA sample and a criminalist's testimony. (*Jimenez, supra,* 165 Cal.App.4th at pp. 77–78.) Having robbed a bank, a man fled on a girl's bicycle and

---

[6] Because we reach this conclusion, we do not address Hall's contention that a forfeiture of his chain of custody claim was due to ineffective assistance of counsel.

abandoned it nearby. (*Ibid.*) A criminalist compared the DNA found on the handlebars of the abandoned bicycle with a reference sample supposedly taken from the defendant. (*Id.* at pp. 79–80.) At trial, the chief investigating officer testified that he ordered the DNA comparison and the police sergeant testified that he made arrangements with a technician to take DNA swabs from the defendant's cheek. (*Ibid.*) The police sergeant testified "conclusorily" that the technician did so and ambiguously stated that either he or the chief investigating officer instructed someone to send the swabs to the criminalist. (*Ibid.*) Moreover, the criminalist testified that he received from the police department "two properly packaged and preserved swabs with paperwork that referred to [the defendant,] and that showed the submitting party was a detective who did not testify at trial, the recorded booking officer was the technician who did not testify at trial, the case number . . . , and the incident date . . . ." (*Id.* at p. 80.) The chief investigating officer testified he received a report showing that the comparison occurred. (*Ibid.*)

Over the defendant's objection based on chain of custody, the criminalist testified that "the probability of anyone but Jimenez leaving the DNA on the left handlebar was one in 190,000 for Hispanics, one in 1.2 million for Caucasians, and one in 6.4 million for African-Americans." (*Jimenez, supra*, 165 Cal.App.4th at p. 79.) On appeal, the *Jimenez* court held the requisite showing of reasonable certainty that there was no substitution of the evidence was but a "chimera." It found the chain of custody to be "woefully inadequate" because "the chain of custody amount[ed] to nothing more than a link here, a link there, with little more than speculation to connect the links into a chain" and "[s]erious questions ar[o]se about what, if anything, the reference sample ha[d] to do with [the defendant]."[7] (165 Cal.App.4th at p. 81.)

While the criminalist's testimony that he received sealed swabs in *Jimenez* failed to convince the *Jimenez* court that the reference sample (ostensibly drawn in a police department) belonged to the defendant, we find the evidence here strongly supports a conclusion that Hall's blood sample was drawn and analyzed by the criminalist. Initially, it is important to recognize that this case involves the testing of one sample as opposed to the comparison of two separate samples in *Jimenez*. In the case at bar, the record shows that soon after Hall's arrest, Deputy Bruner took Hall to the hospital to have Hall's blood drawn. Medical personnel evaluated Hall and had him sign paperwork for the release of his blood. Importantly, although Hall claimed he had no recollection of the events occurring on June 18, 2005, he testified to

---

[7] Specifically, the *Jimenez* court wanted to know: Who took, labeled, and sealed the swabs at the police department? Was protocol followed when transferring the DNA from the police department to the crime lab? Were the swabs still sealed on arrival at the crime lab? (*Jimenez, supra*, 165 Cal.App.4th at p. 80.)

remembering sitting in a chair with a doctor kneeling in front of him, and Hall saying: "You can hit a vein back here. You can draw blood back here." Also, Deputy Bruner testified that Hall's blood was drawn.

Moreover, unlike in *Jimenez*, the high level of ease with which the particular evidence could have been altered is not present here. As noted, in *Jimenez*, there was a comparison between two DNA samples in order to determine whether the defendant committed the robbery. Since the DNA swab supposedly occurred at the police department, the chain of custody testimony provided no reasonable certainty that the DNA sample purportedly obtained from the defendant and the crime scene DNA had not been substituted for one or the other. In short, one part could have been labeled with the defendant's name while the other part could have been labeled as the DNA found at the crime scene. A criminalist receiving the two sealed samples would not have suspected foul play. Thus, the criminalist's testimony in *Jimenez* was inadequate to show to a reasonable certainty that the chain of custody was intact.

█ Here, unlike in *Jimenez*, medical personnel drew Hall's blood in a hospital and the sole purpose of the *single* blood sample analysis was to determine Hall's blood-alcohol level. Medical personnel presumably have no "skin in the game" when collecting biological samples: they have no incentive to alter evidence. Thus, we believe that blood drawing in a hospital environment by medical personnel, as opposed to in a police station by police technicians, substantially lessens the basis for any suspicion that a sample has been substituted. █ Although it is unclear who labeled, sealed, and transported the evidence envelope, it is proper to presume that an official duty has been regularly performed unless there is some evidence to the contrary. (*People v. Lugo* (1962) 203 Cal.App.2d 772, 775 [21 Cal.Rptr. 871]; Evid. Code, § 664.) █ Here, unlike *Jimenez* where no evidence was provided to show the protocol followed by the police department and the crime lab, the criminalist gave detailed testimony as to the procedures the deputies had been trained to follow when collecting a blood sample and submitting it to the crime lab. She also testified as to the procedures the crime lab had in place when transporting and analyzing a blood sample. Hall provided no evidence to show the deputies, the hospital staff, or the crime lab officials failed to perform their duties as regularly performed.

Furthermore, the criminalist testified that she received a sealed evidence envelope that included the date and time the blood was drawn, the name of the hospital where the blood was drawn, the name of the person who took the blood, as well as an illegible signature of the arresting officer beginning with a "B." The evidence envelope also listed Hall's full name and a case number, and was accompanied by a lab receipt—which also included Hall's name,

a case number matching the number in the evidence envelope, and a lab number that was assigned when the crime lab took custody of the blood sample. Most importantly, the criminalist stated there was no indication that either the evidence envelope or the blood vial had previously been opened. Therefore, the evidence shows to a reasonable certainty that the criminalist received and analyzed Hall's unaltered blood sample.

■ Additionally, given that the criminalist received a sealed evidence envelope with a properly labeled blood sample, we find this case to be more like *People v. Riser* (1956) 47 Cal.2d 566 [305 P.2d 1] (*Riser*), disapproved on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98 [338 P.2d 428] and in *People v. Morse* (1964) 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33]. In *Riser*, the defendant did not point to any indication of actual tampering, did not show how the evidence could have been forged, and did not establish that anyone who might have been interested in tampering with the evidence knew where the evidence was located. (*Riser, supra*, 47 Cal.2d at p. 581.) The *Riser* court concluded that the prosecution is not required to negate all possibility of tampering and upheld the trial court's ruling. (*Id.* at p. 580.) Like the defendant in *Riser*, Hall also failed to show there was any tampering with the blood sample. On the contrary, Hall's statements to the deputies that he was "tanked" and that he had been drinking that day support the conclusion that the blood sample had a blood-alcohol level of 0.15 percent. Hall's claim of alteration is speculative at best. Thus, we find that the trial court was within its discretion when it admitted the testimony.

### 2. New Trial Claim

Hall next contends that the trial court committed reversible error when it denied his motion for a new trial on the ground that new evidence had been discovered. He maintains his constitutional rights to due process and confrontation were violated because he was unable to present a complete defense. We disagree.

### a. Motion for a new trial

Hall moved for a new trial on the ground that he had acquired new evidence that would contradict the credibility of Dr. Plotkin's testimony. Hall's "new" impeaching evidence included Dr. Plotkin's interview notes and report, Veterans Affairs (V.A.) medical notes, four articles from medical journals, and five declarations from Hall's relatives and friends.

In the motion brief and hearing, Hall argued that new evidence proved that Dr. Plotkin's statement that Hall fabricated Penelope in order to gain secondary benefits was false. Hall asserted that Dr. Plotkin's notes did not reference

any "fabrication, manipulating, [or] anything of that matter" in regard to Penelope and pointed out that he was unable to prepare a rebuttal because he received Dr. Plotkin's report the day Dr. Plotkin testified. Hall further maintained that declarations from his close friend, former father-in-law and mother-in-law, and two sisters showed Hall believed Penelope was real and saw her numerous times throughout the years. In addition, Hall argued that the medical literature explained that individuals with brain damage like Hall's tended to have delusions and that the V.A. notes showed Hall discussed Penelope without an intent to gain any benefit. Hall insisted that the newly discovered evidence required a new trial.

The trial court found no legal basis to grant the motion for a new trial. The trial court explained that "Penelope was not a big part of this case" because Dr. Plotkin's opinion was not solely based on the issue of Penelope. Furthermore, the trial court pointed out that the declarations contradicted Hall's testimony at trial.

> b. *The trial court properly denied the motion for a new trial*

■ A trial court's determination of a motion for a new trial " ' "will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) A new trial should have been granted if the newly discovered evidence was material to Hall and "he could not, with reasonable diligence, have discovered and produced [the evidence] at the trial." (§ 1181, subd. 8.) In *Delgado*, at page 328, the California Supreme Court identified five factors to consider when ruling on a motion for new trial based on newly discovered evidence: " ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the case; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' "

Moreover, " 'a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant.' " (*People v. Delgado, supra*, 5 Cal.4th at p. 329.) Here, Dr. Plotkin's statements regarding Penelope were not the strongest evidence against Hall. Overwhelming evidence showed Hall was intoxicated and in control of his actions at the time he dangerously drove the motor home. When told to pull over, Hall made eye contact with Deputy Hickey and yelled, "fuck you, fuck you, fuck you." At the time of his arrest, Hall told the arresting deputy, "I'm sorry sir. I know I killed that lady on 47th Street. I fucked up. That's why I was running." Hall had an odor of alcohol emanating

from him and admitted to drinking that day and being "tanked." In a later interview, Hall said he drank three beers and declared that he had not pulled over because the deputies were pointing guns at him and he had been afraid. In addition, at trial, a criminalist testified that Hall, about two hours after the pursuit, had a blood-alcohol level of 0.15 percent.

Critically, "[a] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence" or to contradict a witness of the opposing party. (*Hanton v. Pacific Electric Ry. Co.* (1918) 178 Cal. 616, 623 [174 P. 61]; see *Pandolfo v. Jackson* (1936) 12 Cal.App.2d 232, 236 [55 P.2d 550].) On appeal, Hall admits the newly discovered evidence "was essential to cast doubt on the credibility of Dr. Plotkin's extremely damaging testimony for the prosecution" and that "[a]t a new trial, the newly discovered witnesses would undermine Dr. Plotkin's claim that appellant admitted lying about Penelope to manipulate the mental health system." Thus, the trial court properly denied Hall's motion for a new trial because the purpose of the new evidence was primarily to contradict the prosecution's expert witness. Interestingly, the trial court noted[8] and we agree, the evidence would also contradict Hall's testimony at trial. While Hall testified that he had only seen Penelope a couple of times, the declarations mentioned that Hall had seen Penelope numerous times over the years.[9]

Even assuming it was not impeaching or contradicting evidence, an analysis of the *Delgado* factors shows there was no manifest and unmistakable abuse of discretion. The evidence that Hall submitted with his motion for a new trial was available to him at the time of trial and Hall could have discovered and produced the evidence if he had exercised reasonable diligence. Dr. Plotkin's report and notes were based on an interview with Hall before the trial took place. The medical literature and the V.A. notes were written before the trial. Also, the declarants, Hall's friends and family members, could have been called to testify at the trial. Hall claims that he was unable to prepare for Dr. Plotkin's testimony because he received the doctor's report the same day Dr. Plotkin testified. However, it was Hall who first introduced Penelope during his cross-examination. Even after Dr. Plotkin's testimony regarding Penelope, Hall could have asked for a

---

[8] The trial court stated, "I also find it interesting, I must tell you, Mr. Katz, that in rebuttal when the defendant testified about Penelope, he seemed to intentionally minimize what you have now presented to the court through declaration. He said, 'Penelope is this little girl that I've seen a couple of times. She's a spirit.' . . . So the information you're bringing forth in these declarations is very inconsistent with what the defendant testified under oath."

[9] Hall's ex-wife declared, "Christopher mentioned seeing Penelope at least a dozen times while I was with him." A friend stated, "I have heard of her directly from Chris for many years." Hall's older sister affirmed, "Christopher spoke to me about seeing her on several occasions and described her to me."

continuance to investigate the Penelope issue but Hall made no indication he wanted time to prepare a surrebuttal beyond Hall's testimony.

Additionally, the ostensibly newly discovered evidence was cumulative of evidence already presented at trial. Hall attempted to contradict Dr. Plotkin's testimony with the new evidence. However, at trial, Hall contradicted Dr. Plotkin's statement regarding Penelope. Hall testified that Penelope was not a hallucination and that he told Dr. Plotkin that she was real. Hall also denied telling Dr. Plotkin that he tried to get secondary benefits by making false claims to mental health professionals. Therefore, the new evidence was cumulative because it largely reiterated what Hall had testified at trial. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1252 [74 Cal.Rptr.2d 212, 954 P.2d 475] [holding the trial court properly denied a motion for a new trial based on newly discovered evidence because the " 'new,' posttrial evidence proffered by [an affidavit] did little more than reinforce the views of [a witness] given in his testimony at trial, an opinion the jury had already heard"].)

Furthermore, as Penelope was not a big part of the case, the admission of the additional evidence would not have been sufficient to render a different result. Dr. Plotkin's opinion was not solely based on Penelope. Rather, Dr. Plotkin's opinion was based on the following: (1) there was no hard data to show Hall had an altered mental status; (2) Hall's statement "I know I killed that lady, that's why I ran, and I am sorry"; (3) the fact that Hall swerved around the police vehicles to avoid a collision after making the U-turn and other volitional acts; (4) Hall's admission that he lied in order to obtain narcotics from two different medical facilities; and (5) Hall's prior statements to mental health professionals that he had hallucinations of a female called "Penelope," when in fact he did not, in order to receive secondary gain. Thus, even if the new evidence was admitted to contradict Dr. Plotkin's testimony regarding Penelope, his opinion would still have substantial analytical and factual support. In fact, on cross-examination, Hall questioned Dr. Plotkin's memory of the interview and also questioned Dr. Plotkin regarding a comment made outside of the courtroom. Apparently, Dr. Plotkin told defense counsel that he "should have gotten to [him] first." The jury convicted Hall, despite knowing that Dr. Plotkin's memory of the interview might not have been completely accurate and that Dr. Plotkin might have been amenable to testifying on behalf of Hall.

It is unlikely the jury, even had it received the "new" evidence, would have changed its determination of Hall's guilt. Therefore, the trial court did not abuse its discretion when it denied the motion for a new trial.

## DISPOSITION

The judgment is affirmed.

Mallano, P. J., and Rothschild, J., concurred.

A petition for a rehearing was denied August 26, 2010, and appellant's petition for review by the Supreme Court was denied December 1, 2010, S186544.