Filed 9/17/25  P. v. Little CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063596 |
| v. | (Super. Ct. No. 22WF3192) |
| JENNIFER YVETTE LITTLE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lewis W. Clapp, Judge. Affirmed as modified.

Nicolas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jennifer Yvette Little was convicted of assault with a deadly weapon for stabbing Mark D. with a knife. On appeal, she contends the trial court abused its discretion in denying her motion for a new trial based on newly discovered evidence that was related to her claim of self-defense. Finding no abuse of discretion, we affirm Little's conviction. Due to an undisputed sentencing error, however, we modify the judgment and order the sentencing minutes to be corrected.

STATEMENT OF FACTS

Little and Mark were mutual friends of Mike B., who owned and lived in a Huntington Beach house with his sister and others when this case arose. Little stopped by the house from time to time to check on Mike, whom she has known for years. And Mark visited the house often to socialize with Mike and work on his cars. However, Little and Mark were not well acquainted or particularly friendly with each other. In fact, they suspected each other of stealing things from Mike's house while he was hospitalized for a period in July 2022. Those suspicions set the stage for what occurred at Mike's house on August 2, 2022.

According to Mark, he and Mike were talking about cars in Mike's bedroom that night. Mike was sitting on the bed, and Mark was sitting in a large massage chair that faced toward the bed and away from a door that leads outside. As they were talking, Little entered the room through that door and walked past Mark to talk to Mike. She then turned away from Mike and acted like she was going to leave the room. While walking past Mark in the massage chair, however, she appeared to trip and ended up falling onto Mark.

At first, Mark thought Little had accidentally tripped. But then he noticed there was blood "leaking" onto his chair and all over his shirt, and

2

he realized Little had stabbed him in the side. That led Mark to believe Little had faked the fall in order to stab him.

Following the stabbing, Little did not relent. After getting back on her feet, she began accusing Mark of breaking a gate at Mike's house while he was in the hospital. Then she started to approach Mark in an aggressive manner. Thinking Little was going to attack him again, Mark stood up and pushed her to the floor in front of the massage chair. But as Little was getting back up, she swung at Mark and sliced his forearm with a fold-out knife that had a three to four inch blade. Mark responded by punching and tackling Little. He used his body weight and legs to keep her down, kicking her in the process. But Little continued to resist, and blood was "going everywhere."

Eventually, two other men who were at the house came into the room and broke up the fight by grabbing Mark and throwing him over the side of the bed. At that point, Mark put a towel around his arm to stop the bleeding. Then he drove himself to the hospital, where he received staples for a knife wound to his abdomen, and sutures for a knife wound to his forearm. Both wounds were described by medical personnel as "potentially life-threatening."

The police responded to Mike's house soon after the stabbing. Inside Mike's bedroom, they saw and took photos of blood spots on the armrest and seat of the massage chair. They also noticed a bloody tissue on the floor by the massage chair and blood spots on the floor behind the chair. More blood was found on a piano, album, and picture frame that were on the opposite side of the room. But there was no blood on Mike's bed or on the floor by his bed.

In speaking with the police, Mike stated that when Little entered his bedroom, she started punching Mark and calling him a thief, without any provocation. Mike also said Little fell onto Mark after pretending to trip. However, Mike never said anything about the stabbing itself. The police sensed he was reluctant to discuss the matter for fear of being labeled a snitch. And at trial, he testified he could not recall anything about the incident.

Little testified to a very different version of events. She testified she went to Mike's house on the night in question to talk to one of his housemates. Knowing Mike had just gotten out of the hospital, she decided to drop by his room to see how he was doing. When she saw Mark sitting in the massage chair, she got upset and accused him of stealing from Mike. Mark denied the allegation, which only made Little angrier. She berated Mark and told him to "get the fuck out" of there. But instead of leaving, Mark got up from the massage chair and threatened to kill Little if she did not shut up.

By then, Little had taken a seat next to Mike on the bed. She wanted to leave the room to avoid any further problems, but when she stood up, Mark hit her in the face with his palm and she fell down by the side of the bed. She grabbed the knife and tried to push Mark away, and as they were struggling with each other, the knife pierced his torso.

After that, Little tried to stand up, but Mark slammed her to the floor at the foot of the bed and began stomping on her. He also started bending her arm so violently that she thought he was going to break her arm and kill her. Desperate to get away, Little swung her knife hand toward Mark, slashing his forearm. Little then passed out momentarily, and when she came to, she was very groggy. However, after Mark left for the hospital,

4

she drove herself home. A friend there urged her to call the police, but she was too scared to do so.

At trial, Little testified she stabbed Mark in self-defense. She also claimed her nose, tongue and one of her eyes were bleeding after the incident, and she suffered a bruised ribcage as a result of what Mark did to her. According to Little, her ribcage injury was so severe she had trouble breathing and she was "scooped over" for a few days. But when the police arrested her three days after the incident, she did not appear to have any problems moving, walking, or bending over. Although she did have a scab on her knee, on her shin, and by her right eye, the arresting officer detected no other injuries on her.

During her testimony, Little admitted she had a criminal record. In 2009, she was convicted of residential burglary and unlawfully possessing a firearm, and in 2018, she was convicted of possessing a controlled substance with the intent to sell. For his part, Mark admitted he was once convicted of giving false information to a police officer.

Ultimately, the jury rejected Little's claim of self-defense and convicted her of assault with a deadly weapon. It also found she inflicted great bodily injury on Mark during the assault. After denying Little's new trial motion, the trial court sentenced her to five years in prison.

DISCUSSION

I.

NEW TRIAL MOTION

Little contends the trial court erred in denying her motion for a new trial because it was based on newly discovered evidence that was material to her claim of self-defense. We find no abuse of discretion in the court's decision.

5

*A. Factual Background*

Based on information contained in the presentence probation report, the trial court granted defense counsel's request to continue the sentencing hearing to allow him to investigate new leads in the case. That investigation culminated in defense counsel filing a new trial motion on the grounds of newly discovered evidence.

The motion was supported by affidavits from three people who were living at Mike's house when this case arose, S.B., D.S., and F.G. In their affidavits, they described Mike's house as a chaotic place where homeless people stayed, drugs and alcohol were widely used, and quarrels were not uncommon.

S.B.'s affidavit said he spoke with Mike in the hallway outside Mike's bedroom soon after the stabbing. Mike wanted S.B. to help him clean his room before the police arrived. Knowing Mike's room was a potential crime scene, S.B. did not think that was a good idea. Although S.B. was not able to stop Mike from cleaning his room, he did take several photos of the room before Mike started cleaning. The photos show blood spots on Mike's bedsheets and larger concentrations of blood on the floor by his bed, on the opposite side of the bed from the massage chair. In his affidavit, S.B. stated he did not show the photos to the police because he had "learned to keep [his] mouth shut" while living at Mike's house.

According to D.S., Mike gave her three different versions of events when she spoke to him after the stabbing. First, Mike said Little stabbed Mark after he shoved or kicked her to the ground. Then Mike said Little stabbed Mark while she was giving him a hug in the massage chair, before Mark had even touched her, and as Mark was getting up, Little backed up and tripped over a trunk at the foot of the bed, injuring her face and arm.

6

And lastly, Mike claimed that after Little stabbed Mark in the massage chair, Mark pushed her and "somehow the blood ended up on the other side of the room."

F.G. is Mike's sister. In her affidavit, she alleged she entered Mike's bedroom from a hallway door during the incident, not knowing there was anyone in the room. At that time, Mike was sitting on the bed, Little was on the floor at the foot of the bed, and Mark was on top of her, holding her arm and hitting her. F.G. did not see a knife or any blood. She yelled at Mike for keeping a disorderly house and asked what was going on. Then she returned to her bedroom and avoided the police when they arrived. F.G. admitted in her affidavit she was not in Mike's bedroom very long, and while she was there, she was not paying attention to see if there was blood anywhere.

At the hearing on Little's motion, defense counsel argued the new evidence from S.B., D.S., and F.G. was material to her claim of self-defense. The prosecutor opposed the request, contending the evidence was cumulative of the trial evidence and unlikely to lead to a different verdict on retrial.

The trial court found the evidence was relevant, newly discovered, and diligently obtained. However, the court determined the evidence was largely cumulative and of minimal value to Little, because neither S.B. nor D.S. actually saw what happened between Little and Mark, and F.G. saw only a momentary "snapshot" of their interaction that night. All things considered, the court did not believe it was reasonably probable Little would have obtained a more favorable result at trial had the new evidence been admitted on her behalf. Therefore, the court denied her motion.

*B. Applicable Law and Standard of Review*

Following a guilty verdict, the defendant may move for a new trial on the basis of newly discovered evidence that he or she could not have obtained with reasonable diligence before trial. (Pen. Code, § 1181, subd. (8).) Such motions, however, are "uniformly 'looked upon with disfavor,' for there must be an end to litigation." (*People v. Williams* (1962) 57 Cal.2d 263, 274; accord, *People v. McDaniel* (1976) 16 Cal.3d 156, 179.)

"'The central question in the determination of whether a new trial should be granted on the ground of "newly discovered evidence" is whether that evidence would probably result in a different verdict upon retrial.'" (*People v. Rafael B.D.R.* (2024) 101 Cal.App.5th 385, 395.) That issue is discretionary in nature and "'normally can best be answered by the trial judge, who has been witness to the presentation of all the evidence at trial.'" (*Ibid.*) Accordingly, in reviewing the denial of a motion for a new trial based on newly discovered evidence, we presume the trial court exercised its discretion properly and will not disturb its ruling unless a manifest and unmistakable abuse of discretion clearly appears. (*People v. Davis* (1995) 10 Cal.4th 463, 524; *People v. Soojian* (2010) 190 Cal.App.4th 491, 512.)

An abuse of discretion will be found when the newly discovered evidence contradicts the strongest evidence introduced against the defendant (*People v. Delgado* (1993) 5 Cal.4th 312, 329), but not when the new evidence merely bolsters the defense case by creating a conflict with the prosecution's evidence. (*People v. Hall* (2010) 187 Cal.App.4th 282, 299; *People v. Shoals* (1992) 8 Cal.App.4th 475, 488.)

*C. Analysis*

Little argues her newly discovered evidence was noncumulative and reasonably likely to lead to a different result because it provided fresh

evidence to refute Mark's testimony that she instigated the confrontation by stabbing him in the massage chair without provocation. We agree some of Little's new evidence was noncumulative of the trial evidence. But we find no reason to disturb the trial court's finding the evidence was unlikely to render a different result at trial probable.

Much of Little's argument is based on the photos S.B. took of Mike's bedroom after the stabbing. Those photos were not cumulative because they show what the room looked like before Mike cleaned it and before the police arrived on the scene. Had those photos been admitted into the evidence, the jury would have a different impression of what the room looked like immediately after the stabbing. Whereas the police photos showed only a few drops of blood on the floor and no signs of blood on the bed, S.B.'s photos reveal there was blood spots on the bed and a considerable amount of blood on the floor by Mike's bed, opposite the massage chair.

Nevertheless, we cannot conclude it was probable S.B.'s photos would have materially aided Little's case. Little argues the photos showing a large amount of blood on the floor on the other side of the bed from the massage chair were important to her defense, particularly because there was not much blood found on or around the massage chair. Indeed, Little sees this combination of factors as proof she did not initiate the confrontation by stabbing Mark in the chair, as he contended, but that she instead stabbed him in self-defense after he attacked her on the other side of the bed.

But Mark testified blood was "going everywhere" after Little stabbed him, and the police photos admitted into evidence corroborated his claim that this was a messy confrontation. As noted above, those photos not only show blood on and around the massage chair. They also depict blood on the piano, an album, and a picture frame, which were on the far side of the

9

room from the chair. And, during his closing argument, defense counsel theorized there was even more blood in the room than that. Although the police photos do not show any blood on Mike's bed, counsel suggested that was only because someone had probably changed the sheets before the police arrived on the scene. Because it was undisputed that Mark's blood splattered far and wide, it is hard to imagine how photos of more blood in the room would have changed the outcome of the trial.

In assessing the materiality of S.B.'s photos, we must also keep in mind Mark's testimony about how the confrontation ultimately ended. He stated two men grabbed him and threw him over the side of the bed. Considering Mark had two fresh knife wounds at that time, this could very well explain why there was a considerable amount of blood in that area. Because there were a variety of explanations for that circumstance, we agree with the trial court that the photos were only marginally relevant to Little's defense and unlikely to affect the outcome of the trial.

We reach the same conclusion regarding the information contained in F.G.'s affidavit. She alleged she did not see a knife or any blood when she stepped into Mike's room and saw Mark attacking Little on the floor by Mike's bed. According to Little, this shows Mark was the instigator because if she had stabbed Mark before he attacked her, as Mark claimed at trial, F.G. would have seen blood on his shirt.

By her own admissions, however, F.G. did not stay in the room very long, and she was not paying attention to whether there was any blood anywhere. Moreover, as the Attorney General points out, F.G.'s affidavit "does not specify which direction [Mark] was facing when [she] entered the room. If [Mark] was facing away from her, she would not have seen blood on the front of his shirt." In light of these limitations, it is unlikely the

10

information in F.G.'s affidavit would have changed the jury's mind about who initiated the confrontation between Mark and Little.

That brings us to D.S.'s affidavit, in which she claimed Mike gave her three different versions of events after the stabbing. On their face, two of those versions painted Little as the aggressor in her confrontation with Mark, which would have undermined her claim of self-defense. So, substantively speaking, D.S.'s account of Mike's statements would not have benefited Little at trial.

Nonetheless, Little contends Mike's varying accounts of the stabbing were relevant to impeach his credibility and show he was not an accurate reporter of events. As it was, however, Mike's credibility was already undermined at trial by his professed inability to remember anything about the incident. Although Mike did talk to the police following the stabbing, his statements were guarded, and the investigators testified they sensed he was not being entirely forthright with them. Under these circumstances, the fact Mike allegedly made inconsistent statements to D.S. about the stabbing was unlikely to change the jury's impression of him. In any event, "'evidence which merely impeaches a witness is not significant enough to make a different result probable . . . .'" (*People v. Green* (1982) 130 Cal.App.3d 1, 11.)

For all these reasons, we conclude the trial court acted within its discretion in denying Little's new trial motion. Whether considered separately or as a whole, the affidavits Little offered in support of the motion were not reasonably likely to produce a different verdict upon retrial.

11

## II.

### SENTENCING

At sentencing, the trial court found Little had suffered a prior serious felony conviction for purposes of Penal Code section 667, subdivision (a)(1), and a prior strike conviction for purposes of the Three Strikes law (*id.*, subds. (d) & (e)(1)). Citing subdivision (c) of Penal Code section 1385, the court struck the prior strike conviction in the interest of justice. And it stayed punishment on the prior serious felony conviction.

The Attorney General does not challenge these decisions. However, as he points out, and as Little concedes, the trial court cited the wrong subdivision when it struck the prior strike conviction. Instead of invoking subdivision (c) of Penal Code section 1385, which authorizes the striking of sentence enhancements, the court should have cited subdivision (a), which applies when the court strikes a prior strike conviction in the interest of justice. (See *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 529–530; *People v. Burke* (2023) 89 Cal.App.5th 237, 242–244.) Therefore, we will modify the judgment and order a correction of the sentencing minutes.

## DISPOSITION

The judgment is modified to reflect that Little's prior strike conviction was stricken pursuant to Penal Code section 1385, subdivision (a), and the trial court is ordered to correct its sentencing minutes to reflect that modification. In all other respects, the judgment is affirmed.


GOODING, J.

WE CONCUR:


DELANEY, ACTING P. J.


SCOTT, J.

13