Filed 12/31/13  P. v. Mosely CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062033 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF059631) |
| CURTIS JEFFERY MOSLEY, JR., | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Riverside County, Dale R. Wells, Judge.  Affirmed in part, reversed in part with directions.

Mazur & Mazur and Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Felicity A. Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Curtis Jeffery Mosley, Jr. of 10 counts of robbery arising out of four armed bank robberies that took place in 2007. (Pen. Code,[1] § 211; counts 1-2, 6-7, 9-12, 14-15.) The jury had been presented with an aiding and abetting theory. At a court trial, allegations were found true that Mosley was a principal in the four robberies in which the principal actor was armed with a firearm. (§ 12022, subd. (a)(1).) The court also found true allegations regarding Mosley's serious felony prior conviction (robbery). (§§ 211; 667, subd. (a).)

Before sentencing, Mosley sought and was granted a new trial in 2009, based on then newly discovered evidence relating to DNA, about whether a sheriff's investigator (Adriaan (Rob) Roggeveen; the investigator) might have tampered with the chain of custody on a Halloween mask seized as evidence after one robbery, that was apparently used by an alleged coperpetrator (Mosley's brother Maverick Mosley; not a party in this case).[2] In a prior opinion filed in March 2011, this court reversed that order granting the motion for new trial and remanded to the superior court for reinstatement of the judgment

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] Maverick Mosley (Maverick) was originally charged as a principal in this case but was dismissed when he did not waive his speedy trial rights, and a separate information was refiled against him. Another originally charged codefendant in this case, Jobarea Devar Williams (alleged to be a lookout and aider and abettor), was dismissed when the trial court granted his motion for acquittal. (§ 1118.1.)

2

of conviction and sentencing, which was done. (*People v. Mosely* (Mar. 17, 2011, D056653) [nonpub. opn.]; our prior opinion.)[3]

In those further postjudgment proceedings, Mosley again sought a new trial and moved to dismiss all counts, for lack of provision of his requested additional *Brady*[4] material (evidence discovered about additional unprofessional behavior of the investigator, in a different case involving a different defendant). (§§ 1181, subd. (8); 1385.) The court denied all the motions and sentenced Mosley to a total prison term of 33 years (to be described later; §§ 211; 667, subds. (a), (b)-(i); 12022, subd. (a).)

Mosley now appeals the merits of his convictions and the rulings on the posttrial motions, contending (1) no sufficiently substantial evidence supports the jury's verdict on any of the four bank robberies, as he also argued in his unsuccessful motion for acquittal under section 1118.1; (2) the trial court prejudicially erred by admitting against him the DNA evidence from the Halloween mask used by another at one robbery; and (3) the court erred by denying his renewed motions for new trial, dismissal and for additional *Brady* material remedies, all based on the new allegations of problematic or improper evidence handling in another case by the same investigator. (§§ 1385; 1181, subd. (8).)

As we will show regarding the fourth charged robbery (occurring Aug. 29, 2007; counts 1-2), the evidence against Mosley is sufficient and substantial, and we uphold those convictions and the related true findings on the allegations of vicarious arming

---

3    At Mosley's request, we have augmented this record with the entire record from the previous appeal.

4    *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

3

(§ 12022, subd. (a)(1)) and the serious felony prior conviction (robbery). (§§ 211; 667, subd. (a).)

As to the remaining three charged robberies, occurring in April and June 2007, even if we assume there might have been some evidentiary error at trial in admitting the DNA testing evidence, it would have been harmless as to the affected counts. In any event, we agree with Mosley that those convictions are not sufficiently supported by the record evidence. Moreover, the trial court did not err in denying the postremand/postjudgment motions, even in light of the additional *Brady* arguments now being made.

We shall affirm the judgment of conviction only as to counts 1 and 2 and their related true findings, and the judgment must be reversed with directions to enter acquittals only as to the unsupported counts (6-7, 9-12, 14-15; *People v. Belton* (1979) 23 Cal.3d 516, 521 (*Belton*).) We remand the matter to the trial court for resentencing and to prepare a new modified judgment and abstract of judgment.

I

*INTRODUCTION AND BACKGROUND FACTS*

This record shows without dispute that each of the four charged midafternoon bank robberies in Riverside County involved a lone armed, masked robber rushing into a bank, yelling and cursing at the tellers (calling them bitches), jumping the counter and taking money. In three of the charged robberies, occurring in April, June and August

4

2007, the gunman was described in a way that fits the description of Mosley's brother

Maverick (5'6" to 5'7" tall, thin build, African-American).[5]

In all four instances, the robber evidently fled the bank in a large pickup truck,

each of which was later found to be abandoned while still running, and each of which had

recently been stolen from its owner.  It is also not disputed that the interior of each stolen

"hot truck" was found with red or pink stains that were not there before the thefts (except

for one that might have been from spilled soda), and that were consistent with dye packs

exploding from stolen bank money.[6]  However, none of the stains was chemically tested

to determine if they were dye.

In the amended operative pleading, Mosley was charged with 10 counts of robbery
and three counts of vehicle theft, and various prior offenses and arming enhancements.
(Veh. Code, § 10851, subd. (a); counts 5, 8, 13.)  In limine, defense counsel moved to
exclude DNA evidence found on the Halloween mask discovered in an abandoned truck
in the vicinity of the bank after the June 14, 2007 robbery.  This evidence showed that
Maverick was a contributor to the DNA found on the mask.  Mosley argued that it was
directly relevant only as to Maverick, who was no longer a party in this case, but that it
could still be used to exclude Mosley as a contributor.  The court held several hearings
and eventually admitted the DNA evidence for both purposes (as will be further
summarized in pt. IV.C.2, *post*).

A lengthy trial took place and at the close of the prosecutor's case, both Mosley

and Williams moved for acquittals.  (§ 1118.1.)  The motion was granted as to Williams

and denied as to Mosley.

---

[5]     Maverick is 5'5" to 5'6" and weighs 120 to 125 pounds.  In three of the robberies,
the gunman wore a black ski mask, but in the June 2007 robbery, the gunman wore the
Halloween mask that was located in a truck found after the robbery.

[6]     Dye packs are used by banks to detect stolen money.  When they are triggered by
going past a sensor, they explode, releasing red dye and a tear gas-like chemical.

After receiving instructions about, inter alia, aiding and abetting principles and the requirement that each count should be considered separately, the jury deliberated. It convicted Mosley of all the robbery charges, but acquitted him on the counts of unlawful taking of a vehicle (counts 5, 8, 13). The court found true the allegations about his serious felony prior and vicarious arming.

An extensive posttrial phase ensued: the trial court's granting of the original motion for new trial, and then reversal by this court's prior opinion filed in March 2011, with a remand for reinstatement of the judgment of conviction and for sentencing. In March 2012, Mosley filed renewed motions for new trial and dismissal, based upon the new evidence obtained about derelictions of duty in a different case, by the same investigator who handled the Halloween mask. (§§ 1181, subd. (8); 1385.) Those motions were denied.

At sentencing, Mosley received a term of 33 years, composed of six years for count 1 (three years doubled for a second strike), plus one year for its firearm enhancement (§ 12022, subd. (a)). Consecutive terms on the other robbery counts (including count 2) were imposed (two years each, plus four months enhancement). He received a five-year term on his serious felony prior conviction. (§ 667, subd. (a).)

II

*ISSUES PRESENTED*

In examining the contentions brought forward in this appeal, it is important to note that Mosley's opening brief acknowledges that the previous appellate proceedings in this court did not address issues beyond the original grant of new trial, so this is his first

6

opportunity to argue issues from the entire trial.  At trial, the prosecutor never claimed that Mosley, who has a bad leg and at 5'11" is taller than Maverick, was the robber who feloniously jumped over the counters and forcibly took money from the tellers.  Rather, the theory of the case was that Mosley aided and abetted Maverick, the alleged gunman in all four of the bank robberies, by serving as a getaway driver who met the "hot" truck and left in a different "cold" vehicle.  "Aider-abettor liability exists when a person who does not directly commit a crime assists the direct perpetrator by aid or encouragement, with knowledge of the perpetrator's criminal intent and with the intent to help him carry out the offense."  (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407 (*Miranda*).)

After setting forth our substantial evidence standards of review, we will examine the record evidence for sufficiency on such relevant factors as whether Mosley was present at the scene of any crime, or showed companionship with the robber, and whether his conduct before and after the offenses showed he acted as an aider and abettor.  (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 (*Campbell*); pts. IV, V, *post*.)  In part VI, *post*, we will evaluate the denial of the new trial and related motions to dismiss.

We further observe that no express challenges have been made to the sufficiency of the evidence to support the vicarious arming enhancement allegation, or regarding the serious felony prior conviction.  Such true findings would be reviewed under the same

7

standards applicable to convictions. (*People v. Wilson* (2008) 44 Cal.4th 758, 806

(*Wilson*); *People v. Duran* (2002) 97 Cal.App.4th 1448, 1456-1457.)[7]

III

*APPLICABLE STANDARDS:  SUBSTANTIAL EVIDENCE*

We inquire if sufficient substantial evidence exists in the record from which the

jury could have been satisfied, beyond a reasonable doubt, that Mosley committed each

set of the offenses on which he was convicted. (*People v. Johnson* (1980) 26 Cal.3d 557,

576.)  We apply the same standard of review when the verdict is based on circumstantial

evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  We review the entire record,

drawing all reasonable inferences in favor of the decision. We do not make credibility

determinations nor do we attempt to reweigh the evidence. (*People v. Bolin* (1998) 18

Cal.4th 297, 331-332 (*Bolin*).)  The credibility of witnesses and the weight to be accorded

to the evidence are matters to be determined by the trier of fact. (*People v. Ochoa* (1993)

6 Cal.4th 1199, 1206; Evid. Code, § 312.)

Under section 31, criminal liability may be imposed upon all persons "concerned"

in the commission of a crime. CALCRIM No. 400, as given here, presents the general

principles of aiding and abetting liability. The jury was further instructed with principles

about the use of direct and circumstantial evidence, and told that each charged offense

must be considered separately. (CALCRIM No. 3515.)

---

7    The parties do not discuss the second strike findings made at sentencing, and we
leave that issue to the superior court at resentencing.

8

A person aids and abets the crimes of another when that person (1) acts with knowledge of the unlawful purpose of the perpetrator, (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) An aider and abettor is responsible for the crimes of another when he or she acts with knowledge of the perpetrator's purpose and intentionally aids or encourages the perpetrator. The aider and abettor is liable for the offense committed as a principal. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118, 1120.)

Where a person does not directly commit a crime, but assists "the direct perpetrator by aid or encouragement, with knowledge of the perpetrator's criminal intent and with the intent to help him carry out the offense," then aider-abettor liability exists. (*Miranda*, *supra*, 192 Cal.App.4th 398, 407.) Nevertheless, proof of personal guilt of an offense is required for conviction, as a fundamental principle of American jurisprudence, and "[g]uilt by association is a thoroughly discredited doctrine." (*People v. Chambers* (1964) 231 Cal.App.2d 23, 28-29 (*Chambers*).)

Thus, "[m]ere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime, although these are factors the jury may consider in assessing a defendant's criminal responsibility. [Citation.] Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530 (*Nguyen*).)

9

IV

*ANALYSIS OF AUGUST 29, 2007 OFFENSES*

We next examine the facts of each offense in relationship to the above rules of law. In this section, we will deal primarily with the sufficiency of the evidence on the August 29, 2007 Palm Springs robbery, including Mosley's arrest and direct connection to the apparent getaway vehicle (a blue minivan rented by his girlfriend). To the extent required, we address Mosley's arguments of evidentiary error in admitting the DNA evidence from the Halloween mask associated with the June 2007 robbery.

At all times, we acknowledge that on appeal, Mosley has not conceded the validity of any of these robbery convictions, although the Attorney General's office argues he has effectively done so regarding the August 29, 2007 Palm Springs offenses (but Mosley objects to any such conclusion). Our task is to examine the record without reference to any such supposed concession.

A. Evidence on August 29, 2007 Offenses: Palm Springs (Counts 1-2)

*1. Robbery; Getaway*

The first set of charges presented at trial described the August 29, 2007 armed robbery of the Palm Springs Wells Fargo Bank at 3:35 p.m. The robber was wearing a black ski mask, white ball cap, long sleeved white shirt and dark pants, and had a silver handgun and black bag in his hands. When he demanded money, the tellers complied, and one of them put a dye pack into his bag.

The man ran out of the bank, got into a white pickup truck and drove off. Bank employees called 9-1-1 and gave a description of the truck, including a license plate

10

number, and a description of the robber as African-American, 5'6" to 5'7," with a thin build, carrying a silver handgun. They were not sure whether the truck had other passengers in it.

*2. Arrests*

While driving near the area of the Wells Fargo Bank at about 3:35 p.m., a citizen (Judith Christian) saw a white pickup truck pull off to the side of the road and stop, as a light blue or turquoise-colored minivan pulled up next to it. She noticed two African-American men get out of the truck acting in "a panic mode," then get into the minivan. One was taking off a white garment and hat.

Ms. Christian thought their behavior was kind of strange so she drove back to where she saw the pickup truck, which was still there. She wrote down the license plate number of the truck. The minivan was gone, and when she saw a police car drive by, she followed it to report what she had witnessed. When they reached the bank parking lot, she called 9-1-1, because all the officers there were busy. She reported to the dispatcher that two African-American men had gotten out of a white pickup truck and hurried into a turquoise-colored minivan. About 3:35 p.m., Palm Springs police sent out an alert on the robbery. Police found an abandoned white pickup truck that matched the description of the suspect vehicle, stopped but still running. It turned out to be a stolen vehicle.

Nearby, detectives in an unmarked car observed vehicles leaving the area around the freeway. Approximately 20 minutes after the bank robbery reports, the detectives noticed a light blue minivan approaching the intersection, then making a sudden u-turn. Based on the detectives' information received about a turquoise-colored minivan pulling

11

up near a white truck, they called for back up and followed the minivan. As back up officers arrived and followed it, detectives saw the passenger side sliding door of the minivan open and a black object fly out. Police could see a thin, African-American male standing at the minivan's sliding door, looking toward them, and there was another passenger in the minivan. The patrol car's overhead lights and siren were activated and a traffic stop initiated. At first, the minivan's driver stopped, but when the officers got out and approached, yelling at the occupants to show their hands, the minivan drove away. A police pursuit ensued for a minute or two.

As the driver of the minivan swerved from the center line to the curb, an officer employed a pursuit intervention technique. The minivan's driver lost control and crashed. At gunpoint, officers ordered the three men out of the minivan: Mosley from the driver's seat, and Maverick from the driver's side sliding door. Williams got out of the passenger side of the minivan. They were taken into custody. Maverick's socks had red stains on them, and he had a $100 bill in his hand.

When Mosley, who resided in San Bernardino, was booked into the Palm Springs jail, his wallet and a cell phone taken from his pocket were booked into evidence.

### 3. Investigation

Police searched the undeveloped desert area where they saw the minivan drive by, and found a black ski mask in the gutter. A loaded silver color handgun with black grips was found on top of a bush near the curb. The gun was functional and it had red stains in the chamber and on the cartridges.

12

The white pickup truck, a Ford F-350, had been stolen from a residence in San Bernardino County sometime during the night of August 28-29, 2007. When returned to its owner, it had a damaged ignition and door. The owner said the red stain in it might have resulted from soda pop spilled while the truck was still in his possession.

Ms. Christian, who saw the men get out of the white pickup truck and into the blue Ford Freestar minivan, was taken to see it after it crashed. She said it looked like the minivan she saw earlier, but she could not be completely certain. It had paper license plates on it. Police found another cell phone near the rear of the van, where Maverick had gotten out.

Technicians collected additional evidence from the minivan including tennis shoes, two white baseball hats, two white shirts in large sizes, black pants (later found to have pinkish stains in the pockets), baseball gloves, vise grips, a screwdriver, loose front and rear California license plates, and an Enterprise car rental agreement. The renter on the agreement was Mosley's girlfriend, Michelle Thomas (Thomas; not a party here). She rented the van on August 28 from a nearby Enterprise office.

In addition to the cell phone found in the rear of the minivan where Maverick had been hovering, police found a third cell phone in the console, registered to "Joe Williams."

Testimony from a custodian of records for the cell phone company showed that the phone found in Mosley's pocket had a number of 909-915-8752, registered to Vilecia Weeson, a Radio Shack employee, although it was not made clear at trial what relationship she had to Mosley, if any. Cell phone records showed there had been over

13

800 calls in six months between that phone (referred to here as Mosley's phone), and a phone in Thomas's name, which had a number of 909-644-7156.

Also, the custodian of records identified the phone found in the minivan where Maverick had been hovering as 909-708-5502, registered to Lanny Jake. Cell phone towers can receive calls at an urban range of about two miles, or about 10 miles in a rural area.

When Mosley was interviewed on August 29, 2007, he was willing to talk to one detective (playing the good cop) but told the other detective (the bad cop) that he was too tempestuous. The interview was recorded and played for the jury. Mosley told the detective that he was self-employed and came to the Palm Springs area to look at property. He said his girlfriend had rented the minivan he was driving, and it had no license plates. When followed and stopped by police, he got nervous because his driver's license was suspended, and he had been shot once and did not want to get shot again, so he took off.

## B. June 14, 2007 Offenses: Cathedral City (counts 14-15)

### 1. Robbery; Getaway

The evidence at trial showed that on June 14, 2007, at about 4:10 p.m., two bank tellers at a Cathedral City Pomona First Federal Bank (PFF) saw a man in the bank lobby wearing a black Halloween mask with an orange skeleton face. He was 5'4" to 5'6," medium build, dressed in black clothing. Yelling and cursing, he displayed or pointed his gun at the tellers and demanded money, putting it in his black cloth bag, and then left.

14

Cathedral City police responded to a call about the bank robbery, and seven minutes later, found an abandoned dark-colored pickup truck, about a half mile from the bank, still running. The ignition cover was missing and the outside driver side lock was damaged. The investigator found a reddish stain on the floor in the rear seat area and a Halloween mask hidden under the rear seat.

### 2. Investigation

Later investigation showed that Thomas had rented a silver Nissan truck and a white midsize Mitsubishi SUV from an Enterprise office, for the period of June 3-17. When returned, they had many miles on them. There was no evidence connecting those vehicles with the robbery.

In his defense, Mosley presented the testimony of Joe Cuevas, a homeless man who had observed a black truck pull into a store parking lot the afternoon of the bank robbery. Cuevas said there was one African-American man in the truck and that he looked like he was undressing. About 10 or 15 seconds later, a white sedan-style car came into the parking lot, driven by a white male with light brown or blondish hair. The sole occupant of the truck left the truck idling and got into the backseat of the car, and they left. Cuevas told police that a white person was in the car, but he did not see him clearly.

Investigation of cell phone records and a detective's testimony showed Mosley's cell phone was not active during a 3 3/4-hour window around the time of the robbery (4:10 p.m.) However, Mosley's cell phone contacted or "pinged off" a tower near

15

Whitewater (between Cathedral City and San Bernardino, along the highway) at 7:37 p.m. (almost four hours after the robbery).

Maverick's phone pinged at that same location about 4:59 p.m.

### C. Conclusion: Sufficient Evidence Supports Convictions on August 29, 2007 Offenses (Counts 1-2), and Related True Findings

Based on the above outline, the record evidence shows that as to counts 1 and 2 the following sufficient evidence supports the convictions: Pursuing and arresting officers saw Mosley coming out of the driver's seat of a blue minivan that had been identified as an apparent getaway car from a very recent bank robbery, committed by a person wearing certain clothes. The getaway car was identified because a witness saw two people transferring out of a white truck, identified at the site of the bank robbery, into the blue minivan, in "panic mode," while one changed his clothes. Although Ms. Christian thought the minivan at the crash site looked like the same one she saw earlier, but could not be completely certain, that uncertainty did not undermine other evidence that connected the blue minivan to the robbery.

Specifically, the blue minivan contained evidence of money that showed dye pack effects, consistent with money taken in a bank robbery, and investigators found that Maverick's socks and a gun found nearby also had red stains, and the gun and ski mask were found in the path of the minivan.

Mosley's girlfriend Thomas had rented the minivan, and the replacement of its Enterprise-supplied license plates with paper plates suggests concealment of its purpose as a rental. If Mosley was looking at property, his story is not supported by any real

16

estate magazines or materials found in the van. Also, as the driver of the minivan, Mosley was linked to the renter, Thomas, through cell phone evidence about the 800 calls made between the phone found in his pocket and her phone, over the past six months. Although Mosley offered alternative explanations of why he tried to flee from police in the minivan, the jury did not have to believe him.

With respect to Mosley's appellate claim of evidentiary error regarding the DNA testing evidence about the Halloween mask (developed after the June 14, 2007 robbery), we observe that this case as a whole was tried on the theory that evidence from each set of offenses was cross-admissible. Mosley has not raised any claim on appeal that challenges the record in that particular respect. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.)

In any case, we need not address his evidentiary claim in detail regarding the August 29, 2007 offenses (counts 1-2), because the Halloween mask evidence from the June 2007 robbery is peripheral and essentially irrelevant to the proof of the August 29 robbery, showing Mosley and Maverick were found together in the blue minivan getaway car. When the jury was instructed, they were told that each charged offense must be considered separately. (CALCRIM No. 3515.) More evidence about the connection between Mosley and Maverick would have been cumulative on the August 29 Palm Springs robbery. There was otherwise sufficient evidence introduced and admitted about Mosley's personal connections to the robbery convictions on counts 1 and 2.

Specifically, Mosley, the driver of the blue minivan that crashed during pursuit, was sufficiently linked to the August 29 bank robbery that had just occurred and that was

17

the subject of the pursuit. Mosley's direct links to Maverick, the principal robber, demonstrated that Mosley was "concerned" in the robbery. (§ 31.) More evidence than Mosley's "mere presence at the scene of a crime" was shown, and the circumstantial evidence warrants reasonable inferences that he not only had knowledge of another's criminal purpose, but he also shared that purpose and evidently intended to encourage or facilitate the commission of the crime. (*Nguyen, supra*, 21 Cal.App.4th 518, 529-530.)

As already noted, Mosley has not clearly challenged the sufficiency of the evidence to support the related true findings made by the trial court after the verdict. In any event, nothing brought forward in the briefs or in the record undermines in any way the validity of those findings on the vicarious arming allegation on these two counts (§ 12022, subd. (a)), and the serious felony prior conviction (§ 667, subd. (a)). (See *Wilson*, *supra*, 44 Cal.4th 758, 806.) We shall direct the trial court to conduct resentencing procedures on these counts in accordance with the views expressed in this opinion.

V

*EXAMINATION OF SUFFICIENCY OF THE EVIDENCE:*
*APRIL AND JUNE ROBBERY CONVICTIONS*

We now turn to the record to determine whether the jury could have properly concluded from the direct and circumstantial evidence, beyond a reasonable doubt, that it was Mosley who aided and abetted the next three sets of charged offenses and convictions. (*People v. Johnson*, *supra*, 26 Cal.3d 557, 576.) An inference of identity can depend either upon unique or nearly unique common features or " 'features of

18

substantial but lesser distinctiveness [that] may yield a distinctive combination when considered together.' " (*People v. Vines* (2011) 51 Cal.4th 830, 857 (*Vines*).)

The prosecution's theory was that the August 29 Palm Springs robbery was strikingly similar to the other three robberies, regarding the hot truck vehicles used after takeover style robberies, together with Thomas's rentals (one of which was proven to be used as a "cold" car), and cell phone evidence. The prosecutor had opposed the motion to acquit on those grounds, arguing a reasonable inference of identity between the four robberies could be drawn as to all participants, including Mosley as the getaway driver who must have aided and abetted each robber.

As noted, the jury received instructions on the use of direct and circumstantial evidence, and the weight and reliability of each, separately or together. (CALCRIM No. 223.) It was properly instructed that each charged offense must be considered separately. (CALCRIM No. 3515.)

### A. April 19, 2007 Offenses: Rancho Mirage (Counts 6-7)

#### 1. Robbery; Getaway

Evidence at trial showed that on April 19, 2007 at 4:37 p.m., one armed robber burst into a Rancho Mirage Bank of America wearing a black ski mask and holding a dark bag. He pointed his gun at the tellers and forced them to put money in the bag. The tellers described the man as around 5'10 -6' tall, 180-200 lbs., and having a stocky build, or else he was wearing a lot of clothes.

Surveillance cameras at the bank showed there was a dark or blue pickup truck near its ATM at 4:35 p.m., and that a man ran into the bank but left 45 seconds later.

19

Sheriff's deputies responded to the robbery and investigated a potential suspect vehicle, a large blue pickup truck, found abandoned a quarter mile from the bank. It smelled of chemicals similar to a dye pack odor that would come from money forcibly taken from a bank, and the truck interior had red stains in it.

*2. Investigation*

Technicians examined the blue pickup truck that had been discovered after the robbery, and found that its ignition cover was missing. They found a $10 bill that had a red substance on it, and reddish stains in the back passenger side seat.

Later investigation showed that Thomas had rented an orange Nissan Murano SUV in April from a San Bernardino Enterprise office. When returned, many miles had been put on it. No evidence was presented at trial about what vehicle, if any, the robber used after leaving the bank, and no testimony was presented to connect this vehicle with the robbery.

Investigation of cell phone records showed Mosley's cell phone was not active near the bank during a 4 1/2-hour window around the time of the robbery (4:37 p.m.).

Maverick's cell phone was not active between April 17 and 22, 2007.

However, Mosley's cell phone contacted (or "pinged off") towers near the highway between San Bernardino and Cathedral City on that date, April 19, several times earlier (12:30 p.m.-on) and later (10:15 p.m.) than the robbery. Mosley lived in the San Bernardino area.

20

## 3. Analysis of Insufficient Evidence

A significant problem with the convictions on this count is that the robber was described by the tellers as around 5'10 -6' tall, 180-200 lbs., and seeming to have a stocky build. He does not clearly fit the description of Maverick, who was shorter and thinner.

The evidence of the abandoned "hot" truck that had red stains in it and smelled of chemicals similar to a dye pack odor from stolen bank money does not directly connect Mosley to this offense. Mosley was acquitted of vehicle theft.

Investigators were unable to connect the vehicle Thomas had rented from Enterprise that week with the stolen truck or with any getaway attempt by this robber in a "cold" car, with or without Mosley's assistance. Thomas was not a defendant in the case, and her connection to Mosley through the telephone found on him and their six months of telephone calls does not support any rational inference of guilt. It is not determinative that the cell phone found on him was registered to another, or that the evidence did not show his connection to the named account holder. His cell phone activity before and after the robbery, near towers on the highway near San Bernardino, could have been attributed to his residence in San Bernardino, but in any event does not support an inference that Mosley was a participant in the robbery.

Taken together, the evidence of the hot truck-cold car, takeover-style robbery, and cell phone evidence does not amount to such distinctive features that would support a strong inference of identity of Mosley as a driver or an aider and abettor on April 19, 2007. (*Vines, supra*, 51 Cal.4th 830, 857.) Even drawing all reasonable inferences in favor of the verdict on these counts, we are unable to conclude that anything other than

21

vicarious responsibility was being fastened on Mosley, based on his connection to Maverick (or Thomas). There was no connection of Maverick (or Thomas) to this April 19, 2007 robbery. Guilt by association evidence was not sufficient. (*Chambers, supra*, 231 Cal.App.2d 23, 28-29.) No substantial evidence supports aider-abettor liability on the theory that Mosley assisted this tall, stocky robber in carrying out the offense, while having knowledge of his criminal intent. (*Miranda*, *supra*, 192 Cal.App.4th 398, 407.)

### B. June 29, 2007 Offenses: Rancho Mirage (counts 9-12)

#### *1. Robbery; Getaway*

Evidence presented at trial showed that at 2:15 p.m. on June 29, 2007, one armed robber fitting the description of Maverick (about 5'6," thin to medium build), wearing a dark ski mask and gloves and holding a dark gun, entered the bank. He jumped the counter and took money from four tellers, who put it into his cloth bag. Two of the tellers included money with concealed dye packs. One employee thought he might have seen a second robber near the door. Bank surveillance cameras recorded only one man's movements.

A bank employee locked the door and saw the man leaving in a white pickup truck. Shortly thereafter, sheriff's deputies responded and located an abandoned white Ford pickup truck that was still running, not far from the bank. The truck smelled like chemicals and there were red stains in the rear floorboard area.

22

## 2. *Investigation*

Later investigation showed that Thomas had rented a black Aspen car from Enterprise a few days before the robbery. When returned, it had many miles on it. No evidence was presented at trial about what vehicle, if any, the robber used after leaving the truck.

Investigation of cell phone records for June 29, the day of the 2:15 p.m. robbery, showed that Mosley's cell phone had no calls during the middle of the afternoon. At 5:06 p.m., Mosley's phone had activity in the San Bernardino area, where he lived.

Maverick's cell phone pinged off towers near the Palm Springs highway about an hour after the 2:15 p.m. robbery, and again near San Bernardino about three hours after the robbery. Only Maverick's phone had pinged off a tower near a shopping center across from the bank, 10 minutes before the robbery.

## 3. *Analysis of Insufficient Evidence; Conclusion*

Investigators were unable to connect the black Aspen car Thomas had rented from Enterprise that week with the stolen truck or with any getaway attempt by the robber, with or without Mosley's assistance. Mosley was acquitted of this vehicle theft charge.

The cell phone records, showing he had no calls at the time of the robbery that day, do not support an inference that Mosley was involved in this robbery. His cell phone could have had a legitimate reason to ping off a tower near San Bernardino three hours after the robbery, since Mosley lived in the area. Maverick's phone pinged off a tower near the bank, 10 minutes before the robbery. Although that was some evidence of

23

Maverick's connection to that cell phone and this robbery, the evidence did not link Mosley to it.

Rather, the jurors may have believed that if Maverick (or Thomas) was involved, they could conclude through a guilt by association theory that Mosley had aided and abetted Maverick, but that was not a proper inference. (*Chambers, supra*, 231 Cal.App.2d 23, 28-29.) Under section 31, the prosecution had to demonstrate how Mosley was "concerned" in the commission of these June 29, 2007 counts of robbery, but the record does not show it did so beyond a reasonable doubt by providing evidence of distinctive features that support an inference of identity of Mosley as the getaway driver, or that he otherwise acted as an aider and abettor in this instance. (*Vines, supra*, 51 Cal.4th 830, 857.)

### C. June 14, 2007 Offenses: Cathedral City (Counts 14-15)

#### *1. Robbery and Getaway*

As already described, the Cathedral City bank tellers were robbed at 4:10 p.m. by a man wearing a black Halloween mask. He was 5'4" to 5'6", medium build, dressed in black clothing. After he left, police were called and they found an abandoned dark-colored pickup truck, still running, with damage to the ignition and lock. It had a reddish stain on the floor and a Halloween mask hidden under the rear seat.

In his defense, Mosley presented the testimony of Cuevas, who watched a black truck pull into a parking lot on the afternoon of the bank robbery, and saw an African-American man in the truck, undressing and getting into the back seat of a white sedan-

24

style car that was being driven by a white male with light brown or blondish hair. Then they left. Cuevas told police he did not see the white person in the car clearly.

Investigation showed that Thomas had rented a silver Nissan truck and a white midsize Mitsubishi SUV from an Enterprise office for the period of June 3-17.

Cell phone records mainly showed Mosley's cell phone was not active during a 3 3/4-hour window around the time of the robbery (4:10 p.m.). A few hours after the robbery, at 7:37 p.m., Mosley's cell phone pinged off a tower near Whitewater (between Cathedral City and San Bernardino, along the highway).

Maverick's phone pinged along the same highway at 4:59 p.m., and then in the San Bernardino area at 5:47 p.m., about an hour after the robbery.

### 2. DNA Evidentiary Issues

The evidentiary objections to the Halloween mask DNA conclusions predated Mosley's filing of any of the new trial motions, including the renewed motions based on additional newly discovered evidence related to Roggeveen's defective evidence processing practices (occurring in a different case; see pt. VI, *post*).[8] To the extent the mask evidence about Maverick related to Mosley's guilt of any of the charged robberies, it arguably supported the prosecution's theory that all the same participants were involved in each of the robberies, but it did not do so strongly. We deem it necessary to evaluate

---

8    Roggeveen was involved in a separate prosecution of a different person for burglary, for offenses unrelated to this case. (*People v. Ortega* (Super. Ct. Riverside County, No. INF058751).)

25

this claim only as to the June 14 robbery, since the mask was discovered in the back of the abandoned pickup truck found that day.

An abuse of discretion standard of review applies, and the weighing process under Evidence Code section 352 "depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)[9] " 'The [trial] court's exercise of discretion under Evidence Code section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value.' [Citation.] [¶] . . . '[W]hen ruling on a section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under . . . section 352.' " (*Jennings, supra*, at pp. 1314-1315; see *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 [an evaluation of a trial court's exercise of discretion on severance motions considers the record before it when the ruling was made].)

The trial court at first tentatively excluded this DNA evidence, but after several thorough hearings, it ultimately ruled the entire set of results admissible for purposes of connecting Maverick to the June 2007 or other robberies, or for the defense's other stated purpose of excluding Mosley (and Williams).

---

9    Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, or confusing the issues, or of misleading the jury."

According to Mosley, our comment in the prior opinion (as follows) supports his current position that the evidence was wholly irrelevant except as to Maverick (i.e., "We initially note that the DNA results at issue here related directly to Maverick, and not the defendant. The jury, as fact finder, had the exclusive right to decide what weight to give that evidence.") Suffice it to say that we cannot revisit the issues from the first new trial proceeding and appeal, but now, must examine the currently raised evidentiary issues in light of the entire record.

This record fully demonstrates "the trial court understood and fulfilled its responsibilities under . . . section 352." (*Jennings, supra*, 81 Cal.App.4th 1301, 1315.) In light of the prosecution's theory that the circumstantial evidence demonstrated that the same individuals were involved in all four sets of offenses, the court properly considered whether the DNA evidence from one robbery was probably relevant or probative on each set of robbery charges. In responding to the defense's evolving trial position, the trial court appropriately balanced the prejudicial and probative effects and found that the DNA evidence was admissible not only to exclude Mosley, but also to show that it included Maverick as a DNA contributor. This was a proper exercise of discretion, and Mosley has not pointed to any rule or policy that should have required exclusion of that evidence. (See *Ewoldt, supra,* 7 Cal.4th 380, 404-405.)

### 3. Analysis of Insufficient Evidence

To support the convictions of aiding and abetting this set of robberies, the evidence must show Mosley was present at the scene or was participating with the principal, through demonstrated companionship and conduct before or after the offense.

27

(*Campbell*, *supra*, 25 Cal.App.4th 402, 409.) This robber wore a different type of mask, and the only showing made about any getaway efforts by that robber was the testimony of Cuevas, who told police that he saw an African-American man leaving a black truck, undressing, and getting into the back seat of a white sedan-style car that was being driven by a white male with light brown or blondish hair. That week, Thomas had rented a white Mitsubishi Outlander SUV. The evidence does not address whether it would be easy or difficult to mistake a midsize SUV for a sedan.

We acknowledge that the jury may not have believed Cuevas, and that the credibility of witnesses and the weight of evidence are matters to be determined by the trier of fact. (*People v. Ochoa*, *supra*, 6 Cal.4th 1199, 1206.) Nevertheless, the only companionship and aiding and abetting evidence offered about this offense suggests that the getaway driver was not Mosley, who is African-American, and Mosley was not connected to the white car. No vehicle theft charge was filed regarding this robbery. Thomas's connection to Mosley through cell phone conversations did not support an inference that a vehicle she rented was utilized in these offenses (for which she was not charged). The "hot" truck/rental car evidence is generic in nature and does not support Mosley's conviction in this instance. (*Vines*, *supra*, 51 Cal.4th at p. 857.)

The cell phone evidence is also inconclusive, showing Mosley did not make any calls around the time of the robbery (4:10 p.m.). Three and one-half hours later, his cell phone pinged off a tower near Whitewater (along the highway between San Bernardino and Cathedral City). It may well be significant that Maverick's phone had pinged there about an hour after the robbery, but regarding Mosley, if it shows anything it would only

28

promote a finding of guilt by association. In light of the getaway driver evidence, even less than Mosley's "mere presence at the scene of a crime" was shown here. (*Nguyen*, *supra*, 21 Cal.App.4th 518, 529-530.)

With respect to the June 14, June 29, or April 19, 2007 robberies, this record, together with reasonable inferences to be drawn from the evidence, failed to sufficiently show that Mosley individually (1) acted with knowledge of the unlawful purpose of the robbers, (2) intentionally encouraged or facilitated the commission of these offenses, nor (3) consistently acted to aid, promote or instigate the offenses. (*People v. Beeman*, *supra*, 35 Cal.3d 547, 561.)

VI

*DENIAL OF POSTREMAND MOTIONS*

A. Summary of First New Trial Motion; Reversal by Prior Opinion

To place the current new trial issues in context, we first summarize the original set of postverdict motions, in which Mosley sought a new trial based on newly discovered evidence about the processing of DNA evidence that tied Maverick to the Halloween mask found in the abandoned truck following the June 2007 robbery. In reliance on *Brady, supra*, 373 U.S. 83, Mosley also sought dismissal for nondisclosure of this evidence, arguing that investigator Roggeveen might have tampered with the packaging of that mask, before it was tested.

In our prior opinion, we set forth the history of the collection and packaging of the mask evidence, the various DNA samples and testing, and Investigator Roggeveen's missteps and delays in obtaining processing of the evidence at the San Bernardino

29

County forensic crime lab. The criminalist who received it at the crime lab, Monica Siewertsen, testified about irregularities in the packaging (the Halloween mask was taken out of its previously sealed baggie). However, the DNA testing swabs had remained sealed throughout, until testing. Later, the mask irregularity was attributed to Roggeveen.

In granting the first motion for new trial, the court found the prosecutor was unjustified in failing to reveal to the defense that Investigator Roggeveen was the one who apparently opened the plastic bag. The trial court acknowledged that there was a possibility of some kind of tampering, although the court was not convinced that it had happened. In March 2011, this court reversed that ruling.

### B. Second New Trial, etc. Motions

Once the matter was returned to the trial court, defense counsel proceeded with renewed motions for new trial under section 1181, disclosure or dismissal under *Brady*, and dismissal pursuant to section 1385, subdivision (a) (providing in relevant part: "The judge . . . may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."). All motions contended that around the time of the previous new trial proceedings, Mosley's defense counsel had learned from a confidential informant's anonymous letter dated October 9, 2009 that there was proof that Roggeveen had improperly maintained possession of stolen property he had seized in a different criminal case, involving an unrelated defendant, Ortega. (See fn. 8, *ante*.) Mosley claimed this evidence was "material" and thus, " 'there is a reasonable probability that, had [the evidence] been disclosed to the

30

defense, the result . . . would have been different.' " (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)

Specifically, witnesses at the hearing on the renewed motions testified that on April 5, 2007, Roggeveen seized an X-Box during the criminal investigation in the Ortega case but failed to process it properly as evidence. The sheriff's office confirmed that the retail store from which it was stolen did not request its return. The office kept the X-Box, along with a 50-inch plasma television also seized during the investigation, and planned to formally convert the stolen property to department use, once the case became final. However, that finality requirement was not observed, nor did the Ortega court order for release of property to its rightful owner (which refused to accept it) allow it to be taken outside the department for personal use. In any event, the sheriff's office allowed the X-Box and television to remain on site for some time after the seizures. Eight months later, Roggeveen had the X-Box in his county-issued vehicle when the X-Box was stolen in a vehicle burglary on January 10, 2008. Conflicting reports on the burglary were prepared, and Roggeveen first said it was his property, then later said the X-Box was property recovered in the Ortega criminal case.

In his motions, Mosley contended this recently discovered material was potentially exculpatory, because it made the DNA evidence about the Halloween mask, which Roggeveen also handled, even more unreliable. Mosley also sought dismissal of his convictions on grounds the prosecutor had committed additional misconduct by failing to provide the defense such known evidence that tended to exculpate him, despite his previous *Brady* requests. (*Brady, supra,* 373 U.S. 83.) Mosley argued that the

31

prosecutor's office had known for a long time about the Ortega property investigation, which included investigation into Roggeveen's conduct in handling that evidence, but it unjustifiably delayed in producing that evidence.

After hearing, the trial court denied each of the postremand/postjudgment motions. To analyze Mosley's current arguments on appeal of those rulings, we must take into account the conclusions we already reached above, about the insufficiency of the evidence to support some of Mosley's convictions of robbery (i.e., counts 6-7, 9-12, 14-15).

Thus, we next will address the grounds for the renewed motions regarding counts 1-2 (the Aug. 29, 2007 robbery), since they have now survived substantial evidence review. As we will explain, no different outcome in this case regarding counts 1 and 2 would be reasonably probable if a new trial were granted on the grounds asserted in the motions, and we will uphold the counts 1 and 2 convictions and the related true findings on the vicarious arming enhancement (§ 12022, subd. (a)). Likewise, the true finding on the serious felony prior conviction remains supported by the record. (§ 667, subd. (a).)

However, because of the conclusions we reached about the insufficiency of the evidence to support the remaining convictions of robbery (counts 6-7, 9-12, 14-15), as well as the lack of prejudicial evidentiary error, we need not discuss all the alternative new trial arguments on the merits, as those posttrial motions did not change those particular underlying evidentiary showings. Instead, we shall address the proper disposition for those unsupported robbery convictions, in terms of the double jeopardy

prohibition against retrial on such charges (pt. VI.E, *post*, regarding counts 6-7, 9-12, 14-15).

### C. Standards for Review of Postjudgment Rulings[10]

As in the prior proceedings, Mosley argues the newly discovered evidence (of a similar nature about Roggeveen's defective evidence handling practices, but more extensive and from a different case) would justify the grant of new trial, by making " 'a different result probable on retrial.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.) To evaluate the trial court's exercise of discretion in denying the motion and its related dismissal requests, the same test as set forth in the prior opinion applies:

> "In [*People v. Delgado* (1993) 5 Cal.4th 312, 328], the California Supreme Court identified five factors to consider when ruling on a motion for new trial based on newly discovered evidence [under section 1181, subdivision (8)]: ' " '1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the case; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.' " ' [¶] Moreover, ' "a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant." ' [Citation.]" (*People v. Hall* (2010) 187 Cal.App.4th 282, 298 (*Hall*).)

---

10    In its respondent's brief at footnote 9, the Attorney General has inserted information concerning the status of other then-pending charges filed against Mosley in Riverside County. We acknowledge that similar information was brought to the trial court's attention with regard to continuances of the sentencing and other hearings; nevertheless, it has nothing to do with the issues properly before us. Pursuant to California Rules of Court, rule 8.204(e)(2)(B), we strike from the brief that footnote containing material not in compliance with this rule governing the contents of briefs.

We also take into account this principle as stated in our prior opinion, from *Hall, supra,* 187 Cal.App.4th 282, 298: " 'A new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party." " '[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background.' " (*People v. Dyer* (1988) 45 Cal.3d 26, 52.) The probability of a different result is "assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract." (*In re Sassounian, supra,* 9 Cal.4th 535, 544.) An appellate court utilizes an objective standard for deciding, "based on all the evidence, old and new, whether any second trier of fact, court or jury, would probably reach a different result. We therefore consider the evidence on the basis of objective probabilities." (*People v. Huskins* (1966) 245 Cal.App.2d 859, 862 (*Huskins*).)

## D. Application

Mosley argues that as to all counts, the evidence about Maverick's DNA on the Halloween mask was central to the prosecution case. He claims he was entitled to attack Investigator Roggeveen's credibility to show how he had mishandled evidence in Ortega's case, and therefore, Mosley's defense strategy would permissibly go beyond mere impeachment of the investigator. (*Hall, supra*, 187 Cal.App.4th at p. 298.) Mosley contends that the recently developed evidence about this key witness "tends to destroy [his] testimony by raising grave doubts about [his] veracity and credibility." (*Huskins, supra*, 245 Cal.App.2d 859, 863.)

In *Huskins, supra*, 245 Cal.App.2d 859, 861-864, the court examined circumstances justifying the grant of a new trial, because in that case, the individual key witness whose credibility was challenged with newly discovered evidence was the sole adult witness to connect the defendant (Huskins) with the charged acts of child molestation. Thus, her credibility and motives to fabricate evidence were central to the proof of the crime, but the new evidence impugned them.

Mosley's argument is premised on the concept that the additional information attacking Roggeveen's credibility, from a different case, was material because he was such a crucial or key witness against Mosley, and therefore the standards of *Huskins* must apply. Utilizing an objective test "whether any second trier of fact, court or jury, would probably reach a different result" (*Huskins, supra,* 245 Cal.App.2d 859, 862), we take into account all the evidence, old and new. (*Ibid.*)

Under that analysis, we disagree with Mosley that the evidence Roggeveen mishandled the X-Box would have diminished the prosecutor's strongest evidence against Mosley, the DNA evidence, which he characterizes as "truly the only evidence" that linked him personally to any of the robberies (through his brother Maverick). Rather, with regard to the August 29, 2007 robbery, the proper frame of reference in Mosley's case includes several other witnesses whose credibility was central to the proof of his participation in that crime, and whose testimony showed he was present immediately after it and was integrally connected to it. We refer to the pursuing and arresting officer-witnesses who saw Mosley coming out of the driver's seat of a blue minivan that had been identified as an apparent getaway vehicle; that getaway vehicle was identifiable

35

based upon the citizen-witness who saw the transfer of two African-American males into it in "panic mode," one while changing his clothes. Recent bank robbery reports had described a person wearing clothes of the sort found in the blue minivan.

Moreover, the blue minivan contained evidence of money taken in the robbery, showing dye pack effects, and Maverick's socks and gun had similar red stains. That gun and a ski mask were found in the path of the van. Although Mosley offered alternative explanations of why he tried to flee from police, the jury did not have to believe him. Unlike in *Huskins, supra,* 245 Cal.App.2d 859, 862, much more evidence connected Mosley to the August 29 robbery, than the accusations of one single questionable, mentally ill and unreliable main prosecution witness (as against Huskins).

This case is more analogous to *People v. Green* (1982) 130 Cal.App.3d 1, in which the court found that credibility issues about one police agent's testimony did not justify a new trial, because that agent's testimony was not the sole evidence of guilt. There, the defendant Green conceded that an informant's testimony partially corroborated the agent's version, and there was also some physical evidence of guilt (drugs and money). That additional evidence "does not point to either defendant's innocence. Further, in the case before us, the alleged newly discovered evidence does not remotely approach the damaging level of that which was involved in *Huskins*." (*Id*. at p. 11.)

Where newly discovered evidence is unlikely to have any significant probable impact upon the jury with regard to the central issues in the case, a trial judge is justified in denying a new trial request based on that evidence. (*Huskins, supra,* 245 Cal.App.2d 859, 862-864.) Here, reopening Mosley's case for the trier of fact to reevaluate the

36

credibility or defects of Investigator Roggeveen's account of his evidence handling *as to the Ortega evidence* would not be "of utmost importance" to proof of the current charges in counts 1 and 2. (*Id.* at pp. 864-866.) Rather, the issues about the defective packaging of the Halloween mask have been well aired, and they mainly concern the facts of the June 14, 2007 robbery. With respect to the proof of the August 29 Palm Springs robbery, the mask evidence from the June 2007 robbery was peripheral and essentially irrelevant. More information about Roggeveen's credibility problems would mainly have been cumulative on the August 29 Palm Springs robbery.

This record on counts 1 and 2 does not display the problems identified in *Huskins* (in which the prosecution had presented a "case of such slenderness," that "the discovery of previously unknown evidence which would tend to destroy the credibility of the principal prosecution witness on cross-examination provides a solid basis for a new trial;" *Huskins, supra,* 245 Cal.App.2d 859, 861, 866). Instead, Mosley was witnessed on August 29, as he exited a blue minivan that had previously been identified as a getaway vehicle, and that minivan was linked by evidence it contained to a bank robbery that had just occurred, and it directly linked Mosley to Maverick as the robber. On counts 1 and 2, Mosley's case is not "one of those exceptional cases with unusual facts in which newly-discovered evidence impeaching the credibility of a prosecution witness makes a different result on retrial probable." (*Id.* at p. 864.)

We conclude it is not reasonably probable that the jury would have rejected the totality of the evidence supporting Mosley's liability as an aider and abettor on the August 29, 2007 charges, if Roggeveen's conduct in a different criminal case had been

37

disclosed to the jury. A different outcome in this case would not be reasonably probable if retrial of counts 1 and 2 were allowed. (*In re Sassounian*, *supra*, 9 Cal.4th 535, 544 [" 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome.' "].)

It is unnecessary for us now to analyze the other rulings on the motions, regarding the counts for which the record has shown insufficient evidence in support of the robbery convictions (i.e., counts 6-7, 9-12, 14-15). Overall, the trial court was justified in denying the current new trial motion and related dismissal requests.

### E. Effect of Insufficient Evidence Findings; Disposition

For the reasons explained above as to counts 6, 7, 9, 10, 11, 12, 14 and 15, the double jeopardy principles set out in *Burks v. United States* (1978) 437 U.S. 1, must now be enforced: "[T]he purposes of the Clause would be negated were we to afford the government the opportunity for the proverbial 'second bite at the apple.' " (*Id.* at p. 17.) In *Burks*, the court concluded that no second trial following reversal of a conviction in the first trial for lack of sufficient evidence to sustain the jury's verdict should be permitted, and "the only 'just' remedy available . . . is the direction of a judgment of acquittal." (*Id.* at p. 18.)

As to all these counts (excluding 1 and 2 and the related true findings), no sufficient evidence was produced to connect Mosley to those robberies. Guilt by association evidence was not sufficient. (*Chambers, supra*, 231 Cal.App.2d 23, 28-29.) As such, a general reversal permitting retrial on counts 6, 7, 9, 10, 11, 12, 14, and 15 would not be proper: "Such a retrial would allow the prosecution to accomplish by

38

indirection that which this court holds it cannot do directly." (*Belton, supra*, 23 Cal.3d 516, 527.)  The trial court is directed to conduct further appropriate proceedings and sentencing, including the entry of judgment of acquittal on counts 6, 7, 9, 10, 11, 12, 14, and 15 only.

## DISPOSITION

The judgment is reversed in part as to counts 6, 7, 9, 10, 11, 12, 14, and 15 and the trial court is directed to enter judgment of acquittals on those counts; however, the judgment of conviction is affirmed as to counts 1 and 2 and their related true findings; remanded for resentencing and for the preparation of an amended abstract of judgment.


HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.

McDONALD, J.