Filed 7/7/16  P. v. Lee CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068236 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD246759) |
| RICHARD CHARLES LEE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

In this multiple victim case, which arose out of a shooting incident in March 2013 and involved a mistrial and a second jury trial, Richard Charles Lee and his codefendant, Kemondre Deshawn Hamilton, were charged with attempted murder and numerous other felonies. Hamilton, who ultimately was acquitted of all charges with the exception of one,[1] is not a party to this appeal. As discussed more fully, *post*, the first jury rejected Lee's defense of self-defense and found him guilty of three felony charges, and the second jury acquitted him of the charges that were retried. Challenging two of the three convictions he suffered at the first trial—assault with a semiautomatic firearm on Larry Williams (count 4: § 245, subd. (b)) and shooting at an inhabited dwelling (count 7: § 246)—Lee contends the trial court erroneously denied both his motion to dismiss those two convictions under Penal Code[2] section 1385 and his alternative motion for a new trial as to those counts.[3] We affirm the judgment.

---

[1] In the first trial, a jury convicted Hamilton of being a felon in possession of ammunition. (Pen. Code, § 30305, subd. (a)(1).) In the second trial, he was acquitted of all remaining charges.

[2] All further statutory references are to the Penal Code.

[3] Lee does not challenge his count 9 conviction of possession of a firearm by a felon (§ 29800, subd. (a)(1)).

2

BACKGROUND

A. *Procedural Background*[4]

1. *First jury trial*

In early 2014 an amended information was filed charging Lee with the following nine offenses: three counts of attempted first degree murder (count 1-3: §§ 664, 187, subd. (a) & 189), three counts of assault with a semiautomatic firearm (counts 4-6: § 245, subd. (b)), one count of shooting at an inhabited dwelling (count 7: § 246), one count of shooting at an occupied vehicle (count 8: § 246), and one count of possession of a firearm by a felon (count 9: § 29800, subd. (a)(1)).

The amended information contained sentence enhancement allegations that Lee (1) personally discharged a firearm proximately causing great bodily injury (counts 1-3, 7 & 8: § 12022.53, subd. (d)); (2) personally used a firearm (counts 4-6: § 12022.5, subd. (a)); (3) personally inflicted great bodily injury on victim Williams (count 4: § 12022.7, subd. (a)); (4) committed all nine offenses while released on bail (counts 1-9: § 12022.1, subd. (b)); and (5) committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1) & (4)). The amended information also alleged that Lee had a strike prior conviction (§§ 667, subds. (b)-(i), 668, & 1170.12) and a serious felony prior conviction (§§ 667, subd. (a)(1), 668, & 1192.7, subd. (c)).

---

[4]   This summary pertains to Lee only because his codefendant, Hamilton, is not a party to this appeal.

On March 25, 2014, the jury found Lee guilty of three of the charged offenses: (1) assaulting Williams with a semiautomatic firearm (count 4), (2) shooting at an inhabited dwelling (count 7), and (3) being a felon in possession of a firearm (count 9). The jury found to be true the count 4 allegation that Lee personally used a firearm during the assault, but found to be not true the gang enhancement allegations in counts 4 and 7. The jury found Lee not guilty of attempting to murder Curtis Waters as charged in count 2. The jury could not reach a verdict on the remaining counts and allegations, and the court declared a mistrial as to those counts and allegations.[5]

2. *Lee's retrial*

After the first trial ended in a mistrial, a new information charged Lee in this matter with five offenses: two counts of attempted first degree murder (§§ 664, 187, subd. (a); victims: Williams & Martin, counts 1 & 2, respectively), two counts of assault with a semiautomatic firearm (§ 245, subd. (b); victims: Waters & Martin, counts 4 & 5, respectively), and shooting at an occupied vehicle (count 7: § 246).

The information contained sentence enhancement allegations that Lee (1) personally discharged a firearm proximately causing great bodily injury (counts 1-2: § 12022.53, subds. (c), (d)); (2) personally used a firearm (counts 4-5: § 12022.5, subd. (a)); (3) personally inflicted great bodily injury on Waters and Martin (counts 4 & 5,

---

5       The jury voted 11 to one in favor of finding Lee guilty of attempting to murder Williams (count 1), of assaulting Waters and Travis Martin with a semiautomatic firearm (counts 5 & 6, respectively), and shooting at an occupied vehicle (count 8). The jury voted seven to five in favor of finding Lee guilty of attempting to murder Martin (count 3).

4

respectively, § 12022.7, subd. (a)); and (4) committed all five offenses while released on bail (counts 1-2, 4-5 & 7: § 12022.1, subd. (b)). The amended information also alleged that Lee had a strike prior conviction (§§ 667, subds. (b)-(i), 668, & 1170.12) and a serious felony prior conviction (§§ 667, subd. (a)(1), 668, & 1192.7, subd. (c)).

On March 17, 2015, the jury found Lee not guilty of all five counts.[6] Regarding the three counts of which the first jury found Lee guilty (counts 4, 7 & 9), the court dismissed (1) the great bodily injury allegation (§12022.7, subd. (a)) in count 4 (assaulting Williams with a semiautomatic firearm), (2) the personal-use-of-a-firearm allegation (§ 12022.53, subd. (d)) in count 7 (shooting at an inhabited dwelling), and (3) the gang enhancement allegation (§ 186.22, subd. (b)) in count 9 (felon in possession of a firearm). In a bifurcated trial, the court found to be true the strike prior, serious felony prior, and out-on-bail enhancement allegations.

3. *Lee's posttrial motions and sentencing*

After the second jury rendered its acquittal verdicts, Lee brought a motion under section 1385 for dismissal of two of his three convictions at the first trial: (1) assault on Williams with a semiautomatic firearm (count 4), and (2) shooting at an inhabited dwelling (count 7). Lee claimed that, "in light of the total acquittal at the second trial, which involved the same succession of gunshots" for which he was tried at the first trial, "[a]llowing the two prior convictions of shooting at [Williams] and [Waters's] house

---

6      The jury also found Lee not guilty of attempted voluntary manslaughter of Williams as a lesser included offense of count 1 and not guilty of attempted voluntary manslaughter of Martin as a lesser included offense of count 2.

behind Williams [(counts 4 & 7)] to stand, would result in inconsistent verdicts and would not be in the interest of justice."

Alternatively, Lee moved for a new trial as to those two convictions on grounds of prosecutorial misconduct and newly discovered evidence—alleged perjury by Williams at the second trial—affecting the credibility of Williams to whom those convictions related.

At the sentencing hearing held on April 30, 2015, the court heard and denied these two motions, finding (1) the verdicts were not inconsistent, and Lee's convictions of counts 4 and 7 were supported by sufficient evidence; and (2) the claimed newly discovered evidence was, at most, impeachment evidence, and thus it was not material.

The court also heard and granted Lee's motion under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) to dismiss his strike prior conviction for purposes of sentencing (*Romero* motion). The court also struck its true finding on the out-on-bail enhancement allegation (§ 12022.1, subd. (b)).

The court then sentenced Lee to a total prison term of 12 years eight months, which consisted of the low term of three years for assaulting Williams with a firearm (count 4), plus consecutive terms of three years for the count 4 personal-use-of-a-firearm enhancement (§ 12022.5, subd. (a)), one year eight months (one-third the middle term) for shooting at an inhabited dwelling (count 7), and five years for the serious felony prior. The court also imposed a concurrent middle term of two years for his count 9 conviction of possession of a firearm by a felon.

B. *Factual Background*[7]

1. *The People's Case*

Early in the evening on March 7, 2013, Williams went to his friend Waters's

house. Waters lived with his father on San Alberto Way in southeast San Diego.

Williams and Waters were hanging out in the front yard of Waters's home,

drinking vodka and cranberry drinks. At some point Martin, who was a tree trimmer and

plasterer, had stopped by because he wanted to see if Waters was available to help him on

a job.

Martin, who is about six feet tall, testified that it was getting dark outside and, as

he was talking to Curtis in the front yard, he saw a "kind of short" male with curly hair,

whom he described as African-American or Mexican, walking very slowly in the middle

of the street. Martin thought the man might have had a gun in his back pocket because

his pants were sagging and about to fall off.

Martin testified he yelled to the man to get out of the street because cars were

"flying up and down the street." The man ignored Martin, who felt concerned about the

man and was getting nervous and jittery because something was not right. Martin jogged

across the street to his Yukon sports utility vehicle to get a cigarette lighter to light up a

cigarette "because [he] was getting nervous."

---

7    This summary of the factual background is taken from the evidence presented at
the first trial because the two convictions that Lee challenges in this appeal—assaulting
Williams with a semiautomatic firearm (count 4) and shooting at an inhabited dwelling
(count 7)—resulted from the jury's verdicts in that trial.

When Martin reached the driver's side door of his Yukon, he looked over his right shoulder and saw two men, wearing all black clothing, a couple of houses away running up the street towards him. Martin testified that the man who was in the lead was about six feet two inches tall.

Martin testified that he jumped inside his Yukon and when he shut the door and leaned down to get his lighter he heard a gunshot and the left rear cargo (quarter panel) window of the Yukon "explode." He immediately dove onto the passenger-side seat. Martin heard several bullets hit his vehicle. In addition to the one that shattered the side cargo window, a bullet hit his door and another hit a wheel rim. Martin testified he believed the taller man fired the first shot at him because that man was the "lead man" who was in front.

Martin looked out the rear window and saw the two males standing side by side in the middle of the street. A streetlight behind them made it difficult for Martin to see their faces. Martin saw the taller man shooting at Waters's home, and he could see the flame from the gun as the taller man was firing. Martin's view of the second man was obstructed by the taller man, and Martin could not say whether the second man was also shooting at the house. After the shooting stopped, Martin saw the two assailants run south down San Alberto Way. Martin testified he did not know Lee when this incident occurred.

As this was happening, Williams was near the bottom of the driveway. Waters had gone inside the house. Williams testified that as soon as he heard the gunshots, he ran toward the front door of the house.

8

Waters testified he looked out the front door when he heard the gunshots, and he saw a "figure" wearing a black hooded sweatshirt and muzzle flashes coming from his handgun. The shooter was in the middle of the street in front of the driveway. At trial, Waters indicated he was under stress when he witnessed the shooting, and he testified he did not see a second male. After the incident, Waters told San Diego Police Officer Tobia Terranova that he saw two people standing in the street, but he thought only one person was shooting.

After Williams ran inside the house, he realized that he had been shot in his right side at the belt line. Waters's father called 911 to report the shooting. Martin drove home before the police arrived. An ambulance service transported Williams to a hospital where his gunshot wound was treated. The trauma surgeon left the bullet inside of Williams because removing the bullet would have caused more injury.

Williams testified he went home that night. He indicated at trial that he did not know Lee when the shooting incident occurred.

Officer Tennebaum testified he was in the vicinity that night and heard semiautomatic gunfire. As he was driving toward the sound in his marked police car, he saw a dark-colored Nissan Altima pull away from the curb and accelerate rapidly as it drove away. Believing this car had been involved in the shooting, Officer Tennebaum activated his overhead emergency lights and siren and pursued it.

At some point Lee, who was driving the Nissan, lost control of the car and crashed into the front yard on Los Angeles Place. Hamilton got out of the front passenger door and ran through someone's yard. Lee got out of the car and began running towards the

9

driveway of the house with a gun in his hand. Lee dropped the gun and jumped over a fence into a small canyon.

With the assistance of a San Diego Police Department helicopter, officers found Lee and Hamilton hiding in the canyon. Both Lee and Hamilton appeared to be under the influence of a controlled substance. A small baggie with crystal methamphetamine was found in Hamilton's pocket. A vial with what was suspected to be PCP was found in the center console of the Nissan.

Officer Tennebaum testified that the gun Lee dropped was a black semiautomatic Glock handgun, it had been "fired dry," and the magazine was empty. Eleven nine-millimeter caliber shell casings were found in the street in front of Waters's home. An expended bullet was found in the gutter. Ten of the 11 shell casings were from Remington brand nine-millimeter caliber cartridges, and they had been fired from Lee's nine-millimeter Glock 26 handgun. The 11th casing was from a Winchester brand nine-millimeter caliber cartridge. This casing was not fired from the Glock 26.

Waters's house had been shot three times, and all of the bullets hit the wall of the converted garage near the front entry. One of the rounds penetrated through the wall and a lead fragment was recovered from the floor. Two vehicles that were parked in front of the house were also struck.

A neighbor later found a gun magazine in a crack in the street pavement near 505 Los Angeles Place. The magazine contained six Winchester nine-millimeter caliber bullets. This type of magazine does not fit into a Glock handgun.

*Gang expert testimony*

The prosecution's gang expert, San Diego Police Detective Jon Brown, testified that Eastside Skyline Piru is a criminal street gang that is a known Blood gang set. The gang has about 450 known or documented members, most of whom are African-American. The geographical "turf" it defends is the southeast portion of the City of San Diego, primarily the Skyline community. Specifically, the gang's geographic area extends from 58th Street or Valencia Parkway on the west, to the 125 freeway on the east, to about Imperial Avenue or Market Street on the north, and to the 54 freeway on the south.

Although the gang's natural rivals are Crips, its biggest rival is Lincoln Park, which is another Blood set. The Eastside Skyline Piru defends its turf through violent acts. Detective Brown testified that the gang's members "[are not] going to tolerate rival gang members coming into that area and selling drugs, doing acts. They consider that their gang territory."

The Eastside Skyline Piru's common colors are red and black, and the gang's common signs or symbols include the letters "P" and "Ru," and the number "80" for the 8,000 block of Skyline. Eastside Skyline Piru's members often wear Philadelphia Phillies clothing because it is red and has the "P" emblem. They also wear St. Louis Cardinals baseball jerseys or hats, and San Francisco 49ers jersey because Jerry Rice was number 80. Detective Brown opined that the gang's primary activities are murder, assault with a deadly weapon, drive-by shootings at dwellings, kidnapping, torture, drug sales, and auto theft.

11

Brown opined that Hamilton is an active Eastside Skyline Piru gang member. He also opined that Lee is an active Eastside Skyline Piru gang member. Lee is a well-documented member of that gang, and he admitted gang affiliation, had gang tattoos, and associated with known gang members.

After given a hypothetical based on the facts of this case, Detective Brown opined that the shooting was committed for the benefit of, and in association with a criminal street gang.

*Stipulations*

The parties stipulated to the following facts: (1) the white crystalline substance found in Hamilton's pants on March 7, 2013, was 4.9 grams of methamphetamine; (2) no fingerprints were found on either the magazine or ammunition; (3) on November 14, 2001, Hamilton was convicted of selling rock cocaine, a felony that would prohibit him from owning or possessing a firearm or ammunition; and (4) as of April 12, 1996, Lee was convicted of a felony that would prohibit him from owning, purchasing, receiving, or possessing a firearm.

B. *Defense Case*

Lee testified in his own defense, claiming he acted in self-defense. In early March 2013 he worked at Adult Emporium, a pornography shop, and he knew Williams because Williams was a regular customer there.

Lee admitted he sold drugs at that time on a wholesale basis. He testified he had both an iPhone, which he referred to as his personal phone, and a "trap phone," which he used to sell drugs.

12

Lee testified that he fronted Williams one ounce of crystal methamphetamine on consignment in February 2013 because he thought Williams was a drug dealer, and he told Williams to return the following Monday with payment of $650. Lee did not meet with Williams that following Monday because he (Lee) was shot several times the day after he gave the drugs to Williams; Lee did not return to his job at Adult Emporium. After he was shot, Lee obtained a Glock 26 pistol from another Eastside Skyline Piru gang member for protection, and he also acquired the Trap phone.

At night on March 7, 2013, Lee drove to Waters's home to collect the money from Williams because he needed money to go to Las Vegas. Lee knew Williams hung out there. Lee had picked up Hamilton earlier, and Hamilton was passed out in the front passenger seat of the car when Lee got out to walk up to Waters's house.

Lee testified that as he drove south on San Alberto Way past Waters's house, which was to his right, he almost hit someone walking in the street and then he saw Williams's truck and pulled over to the curb. Lee saw Williams and another person sitting at the bottom of the driveway. Knowing he was in Lincoln Park gang territory, Lee grabbed his phone and put it in his hoodie, got out of the car with his gun in his back pocket, put up his hoodie, and walked up the street towards Waters's house. Lee saw Martin walk over to his vehicle across the street from Waters's house and reach inside.

Lee testified that when Martin reached inside the car, he (Lee) "heard a thump," which he believed was the sound of a gun hitting the floorboard. Lee reacted by grabbing his gun in his back pocket. He testified that Martin "racked" the slide of a gun, Martin

13

fired the gun at him, and he (Lee) pulled out his gun and "just let everything go" by firing his gun at Martin.

Lee then testified that he saw Williams move, he did not know what Williams was doing, and, although he thought Williams might be reaching for a gun, "[he] didn't know." Lee testified he then fired several rounds to the left towards Williams and the house.

On cross-examination, Lee testified he was not trying to shoot anybody; he was shooting "in one spinning motion" and trying to "back everybody off me."

Lee testified he ran back to his car and Hamilton was "still out of it" inside. As he drove away south on San Alberto Way, Lee noticed blue and red lights from a police car. Lee tried to evade the officer and ended up crashing the car in front of a house on Los Angeles Place. Lee testified that when he exited the car and tried to run away, he tried to "ditch" his gun and hide from the police.

DISCUSSION

I. *DENIAL OF LEE'S NEW TRIAL MOTION* (*COUNTS 4 & 7*)

Lee first contends the court abused its discretion and violated his right to due process by denying his motion for a new trial in which he challenged his convictions at the first trial of assault on Williams with a semiautomatic firearm (count 4) and shooting at an inhabited dwelling (count 7). We reject this contention.

14

A. *Background*

1. *Lee's defense of self-defense*

The defense theory at both trials was that Lee acted in self-defense when he fired his Glock semiautomatic handgun at Williams, Martin, and Waters's house.

2. *Cell phone evidence*

During the first trial in early March 2014, the prosecution presented evidence that Williams did not have a cellular telephone (cell phone). Specifically, Detective Castro testified that during his investigation of telephone records in this case he obtained two telephone numbers from Williams at the hospital: a home telephone number and a cell phone number. As defense counsel acknowledged at the hearing on Lee's new trial motion (discussed, *post*), which the court conducted during the sentencing proceeding after the second trial, Williams was never asked during the first trial whether he had a cell phone.

However, during the second trial in February 2015, Williams testified on direct examination that he did not have a cell phone and that people contacted him by calling his landline at home. On cross-examination Williams again testified that he did not have a cell phone.

3. *Lee's motion for new trial*

In April 2015, after the second jury rendered their verdicts acquitting Lee of all of the retried charges, Lee brought a motion for new trial challenging two of the three convictions he suffered at the first trial: assault on Williams with a semiautomatic

15

firearm (count 4) and shooting at an inhabited dwelling (count 7).[8] As pertinent here, Lee sought a new trial on those two counts on the statutory ground of newly discovered evidence.  (§ 1181, subd. (8).)

Specifically, Lee argued that Williams's testimony at the second trial that he did not have a cell phone was perjury that constituted material newly discovered evidence that warranted a new trial on counts 4 and 7 because it raised "credibility issues involving this perjured testimony."  Noting that his defense at both trials was that he acted in self-defense during the shooting incident, Lee asserted that "the weight of [Williams's] testimony played a crucial role because it went to the relationship between [himself (Lee)] and [Williams]."  He also asserted that Williams's "cell phone lie" at the second trial was a "mountain-size lie under oath" that "extended beyond mere impeachment evidence," and that the result of the first trial "would have been more favorable" to him "[h]ad this perjury by [Williams] occurred at the first trial" because the "[first jury's] view of this witness's testimony would [have been] even more shaky" and would have resulted in a mistrial as to counts 4 and 7.

In opposing Lee's new trial motion, the People argued that the purported newly discovered evidence—Williams's testimony at the second trial that he did not have a cell phone—was nothing more than impeachment evidence, and a new trial may not be granted on the basis of newly discovered impeachment evidence.  The People also argued that the "fatal flaw" with Lee's argument was that he "never explain[ed]" how Williams's

---

8       In his new trial motion, Lee did not contest his count 9 conviction of possession of a firearm by a felon.

testimony at the second trial was material. Specifically, the People asserted that Lee "[did not] even attempt to link this 'perjury' of cell phone possession to drug sales, a drug transaction between [Lee] and Williams, or how this in any degree establishe[d] a need to shoot [Williams]."

a. *Ruling*

The court denied Lee's new trial motion, finding that Williams's testimony at the second trial that he did not have a cell phone was, "at the most, impeachment evidence," and it was not material newly discovered evidence.

B. *Applicable Legal Principles*

A trial court may grant a defendant's motion for a new trial in a criminal case "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. (8).)

A motion for a new trial based on newly discovered evidence is viewed with disfavor, and a trial court's denial of such a motion rarely will result in a reversal on appeal. (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1151; *People v. Fairchild* (1962) 209 Cal.App.2d 82, 84.)

To obtain a new trial under section 1181, subdivision (8), the moving defendant must show (1) the evidence, and not simply its materiality, is newly discovered; (2) the evidence is not merely cumulative; (3) the defendant in the exercise of reasonable diligence could not have discovered and produced the evidence at trial; (4) the newly discovered evidence is of such strength that a result more favorable to the defendant is

17

probable if the new evidence is admitted on retrial; and (5) these facts are shown by the best evidence of which the case admits. (*People v. Howard* (2010) 51 Cal.4th 15, 43; 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Judgment, §§ 103, p. 145 & 105, p. 146.)

"[W]hen a defendant makes a motion for a new trial based on newly discovered evidence, he has met his burden of establishing that a different result is probable on retrial of the case if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented." (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.)

"'A new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party.'" (*People v. Hall* (2010) 187 Cal.App.4th 282, 299.)

A trial court's denial of a motion for a new trial will not be disturbed on appeal unless a manifest and unmistakable abuse of discretion is clearly shown. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

C. *Analysis*

In claiming the court's denial of his new trial motion following the second trial was reversible error with respect to his convictions of counts 4 and 7 (assault on Williams with a semiautomatic firearm and shooting at an inhabited dwelling, respectively) at the first trial, Lee asserts Williams's testimony at the second trial that he did not have a cell phone—which Lee characterizes as perjury—was material to his defense of self-defense for two reasons: (1) "the jury's assessment of the credibility of the parties to the

18

[shooting] incident, including Williams, Martin, and [Lee], was crucial to its determination of whether the prosecution had proven beyond a reasonable doubt that [Lee] had not acted in self defense," and "[*t*]*he fact that Williams committed perjury . . . was material to his credibility*" (italics added); and (2) "[h]ad defense counsel known that Williams would commit perjury to deny the existence of a [cell] phone, his cross-examination at the first trial would have raised the existence of potentially exculpatory and/or impeaching evidence on the cell phone, which in turn would have bolstered [Lee's] testimony, or at least created reasonable doubt, that [Lee] acted in self-defense."

These assertions are unavailing. As already discussed, "'[a] new trial on the ground of newly discovered evidence is not granted where the only value of the newly discovered testimony is as impeaching evidence' or to contradict a witness of the opposing party.'" (*People v. Hall*, *supra*, 187 Cal.App.4th at p. 299.) Here, Lee acknowledges that the newly discovered evidence—Williams's testimony at the second trial that he did not have a cell phone[9]—was "material to his credibility" as a prosecution witness at the first trial. In other words, as the court properly found in denying Lee's new trial motion, Williams's subject testimony at the second trial was, "at the most, impeachment evidence." Because a trial court may not grant a new trial motion based on newly discovered impeachment evidence, we conclude the court did not abuse its

---

9    As noted, *ante*, defense counsel acknowledged at the hearing on Lee's new trial motion that Williams was never asked during the first trial whether he had a cell phone.

19

discretion or violate Lee's constitutional right to due process by denying his new trial motion.  (*Hall*, at p. 299.)

We also conclude Lee has failed to meet his burden on appeal of showing the purported newly discovered evidence would have resulted in more favorable verdicts on counts 4 and 7 had it been discovered and presented to the jury at the first trial.  (See *People v. Howard*, supra, 51 Cal.4th at p. 42 [moving defendant must show the newly discovered evidence is of such strength that a result more favorable to the defendant is probable if the new evidence is admitted on retrial].)  When Lee testified in his own defense at the first trial, he did not dispute that he shot Williams and shot at Waters's house toward which Williams ran.  The only issue was whether Lee did so lawfully while acting in self-defense.  Lee testified that, after he fired his Glock at Martin, he saw Williams move.  He did not know what Williams was doing, and, although he thought Williams might be reaching for a gun, "[he] didn't know."  Lee testified he then fired several rounds to the left towards Williams and the house.

On cross-examination, he testified he was shooting "in one spinning motion" and trying to "back everybody off me."  There was no evidence that Williams had a gun, or that he posed a threat to Lee, or that he did something that would justify Lee's use of deadly force.

Asserting that Williams's "false testimony" at the second trial that he did not have a cell phone was evidence that "[he] was a liar," Lee speculatively claims that, if defense counsel had known about it at the first trial, this newly discovered evidence "could [have led] to further investigation and discovery to establish [Williams's] connection to drug

20

sales and bolster [Lee's] version of events." However, even if the defense could have used the purported newly discovered evidence to discover cell phone evidence to bolster Lee's testimony at the first trial that he went to Waters's house to collect money from Williams for drugs Lee fronted to him on consignment, the trial evidence still showed that Lee shot unarmed Williams as Williams was trying to run into the house after Lee began his shooting spree by firing his Glock at Martin.

For all of the foregoing reasons, we conclude the court properly denied Lee's new trial motion.

## II.  *DENIAL OF LEE'S MOTION TO DISMISS HIS CONVICTIONS OF COUNTS 4 AND 7*

Lee also contends the court abused its discretion and violated his right to due process by denying his motion under section 1385[10] to dismiss his convictions at the first trial of assaulting Williams with a semiautomatic firearm (count 4) and shooting at Waters's inhabited dwelling (count 7), because the jury's verdicts finding him guilty of those offenses were inconsistent with the second jury's verdicts acquitting him of the charges that were retried at the second trial.  We reject this contention.

A.  *Background*

1.  *Lee's motion to dismiss his convictions of counts 4 and 7 at the first trial*

As noted, *ante*, the second jury acquitted Lee of attempted first degree murder, assault with a semiautomatic firearm, and shooting at an occupied vehicle.  Based on

---

[10]    Section 1385, subdivision (a) provides in part that a trial court "may, either of [its] own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed."

21

those acquittals, Lee brought a motion under section 1385 for dismissal of two of the three convictions he suffered at the first trial, namely: (1) assault on Williams with a semiautomatic firearm (count 4), and (2) shooting at an inhabited dwelling (count 7). Lee asserted that, "in light of the total acquittal at the second trial, which involved the same succession of gunshots" for which he was tried at the first trial, "[a]llowing the two prior convictions of shooting at [Williams] and [Waters's] house behind Williams [(counts 4 & 7)] to stand, would result in inconsistent verdicts and would not be in the interest of justice."

The People opposed Lee's dismissal motion, arguing the verdicts in the two trials were not inconsistent. The People noted that the first jury found Lee guilty of assaulting Williams with a firearm in violation of section 245, subdivision (b), and of shooting Waters's house, an inhabited dwelling, in violation of section 246; and the second jury "acquitted [Lee] of shooting at [Waters] and [Martin], shooting at [Martin's] car, and [attempting to] murder [Williams]." The People argued that, "[a]s those verdicts were from different juries in separate cases, they are not legally inconsistent."

a. *Ruling*

At the sentencing hearing, the court heard and denied Lee's dismissal motion, finding that the two challenged verdicts in the first trial (counts 4 and 7) were not inconsistent with the verdicts of acquittal in the second trial, and that there was sufficient evidence to support the convictions in the first trial. In support of its findings, the court stated:

22

"[Lee] admitted he was dealing drugs at the time. [Lee's] version is that he went to go collect money from [Williams] because he was going to Las Vegas. . . .

"So [Lee] [en]counters [Martin. . . . [I]n the first trial [the jury] found that [Williams] was just standing in the front yard and got shot.

"Now, maybe [Williams] was buying dope from [Lee]. Maybe he did owe [Lee] money. But I think that given how dark it was out there, given the fact that *even* [*Lee*] *says that he didn't really kind of have contact with* [*Williams*], *there's really no evidence that* [*Williams*] *was doing anything but standing out in front of the house*.

"And [Waters[11]] was standing in front of the door, he testified, and heard shots ring out. But there . . . wasn't any evidence that he was an intended target. Just that there [were] shots fired and some shots fired came close enough to him to make him bail into the house.

"And so [Williams] is the only person that got hit and . . . *I could see a jury saying* [*Lee*] *had a right to defend himself against* [*Martin*], *but then he went beyond his right to self-defense because he involved other people in the shooting that were not involved with his altercation with* [*Martin*].

"*And so I don't think it's an inconsistent verdict given the fact that* Mr.—you know, *your right to self-defense ends when the danger ends.* And *I can see a jury saying* [*Lee*] *shot at* [*Martin's*] *car, shot at* [*Martin*] *but didn't have the right to shoot at the house and didn't have the right to shoot* [*in Williams's*] *direction*.

"So . . . *that's not an inconsistent verdict* frankly." (Italics added.)

---

11     At the first trial, the jury found Lee not guilty of the count 2 charge that he attempted to murder Waters, and it was unable to reach a verdict on the count 5 charge that he assaulted Waters with a semiautomatic firearm. At the second trial, Lee was retried on the charge he assaulted Waters with a semiautomatic firearm, and the jury found him not guilty of that offense.

23

B. *Analysis*

Lee's claim that the court erred in denying his motion to dismiss his convictions at the first trial of assaulting Williams with a semiautomatic firearm (count 4) and shooting at Waters's inhabited dwelling (count 7) is based on his assertions that (1) his defense of self-defense was the same at both trials, (2) his shootings were "all one continuous action," and thus (3) the first jury's verdicts finding him guilty of counts 4 and 7 were inconsistent with the second jury's verdicts acquitting him of the retried counts that charged him with attempted murder (of Williams, Martin, and Waters), assault on Martin and Waters with a semiautomatic firearm, and shooting at an occupied vehicle. Lee also asserts "the second jury necessarily found that [his] shooting was lawfully justified as self-defense, or that the prosecution had not met its burden to prove that the shooting was not justified by self-defense." He further asserts that "[a]t both trials, the evidence reflected that the shooting was all one continuous act as [he] first shot toward Martin and then continued shooting as he spun around to back everyone off of him and escape."

Lee 's claim and supporting assertions are unavailing. Section 954 provides in part: "An acquittal of one or more counts shall not be deemed an acquittal of any other count." "It is well established that, under section 954, inconsistent verdicts are allowed to stand if the verdicts are otherwise supported by substantial evidence." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405, citing *People v. Lewis* (2001) 25 Cal.4th 610, 656.)

We conclude the court did not err in denying Lee's motion to dismiss his convictions of counts 4 and 7 because (1) the court properly found the first jury's verdicts

24

finding Lee guilty of those two counts were not inconsistent with the second jury's verdicts of acquittal on the retried counts, and (2) even if the verdicts were inconsistent, the court properly found Lee's convictions of counts 4 and 7 were supported by substantial evidence.

As noted, Lee's defense at both trials was that of self-defense. The defense of self-defense applies only as long as the need to defend one's self exists. (*People v. Martin* (1980) 101 Cal.App.3d 1000, 1010 (*Martin*).) As given at Lee's trials, CALCRIM No. 3474, states: "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."

Here, Lee's claim of self-defense was based on his own testimony that as he was walking up the street toward Waters's house and approaching Martin, he "heard a thump" after Martin reached inside his car across the street from the house, he (Lee) believed the noise was the sound of a gun hitting the floorboard, he reacted by putting his hand on the Glock handgun in his back pocket, Martin fired a gun at him, and he (Lee) pulled out his own gun and "just let everything go" by firing it at Martin.

Lee's claim of self-defense also was based on his testimony that, after he fired at Martin, he saw Williams move, he did not know what Williams was doing, and, although he thought Williams might be reaching for a gun, "[he] didn't know." Lee testified he then fired several rounds to the left towards Williams and the house. On cross-examination, Lee testified he was not trying to shoot anybody; rather, he was shooting "in one spinning motion" and trying to "back everybody off me."

25

For purposes of Lee's defense of self-defense, Martin was the attacker because Lee testified that he fired a gun at Lee, and Lee did not testify that Williams, Waters, or anyone else at the scene had a weapon, attacked him, or even threatened to attack him. There was no evidence that Waters was outside the house at the time of the shootings. By firing his Glock at Martin, Lee apparently succeeded in getting Martin to "back . . . off [him]" because Lee did not testify that Martin continued shooting at him after he fired at Martin. Lee's right to use force in self-defense ended when Lee fired at Martin. (See *Martin*, *supra*, 101 Cal.App.3d at p. 1010; CALCRIM No. 3474.) Thus, it was reasonable for the second jury to acquit Lee of the charges that related to Martin and Waters.

However, substantial evidence supported the first jury's verdicts finding Lee guilty of assaulting Williams with a firearm and shooting at Waters's house. It is undisputed that Williams was standing in front of Waters's house across the street from Martin's parked car when Lee fired at Martin. Williams testified that as soon as he heard the gunshots, he ran towards the front door of the house. Although Lee testified he saw Williams move he thought Williams might be reaching for a gun, he admitted he did not know what Williams was doing. Lee also admitted that when he fired his gun at Williams and the house, he was shooting "in one spinning motion" and trying to "back everybody off me." Substantial evidence thus supports the first jury's rejection of Lee's defense of self-defense with regard to counts 4 and 7. It also was reasonable for the second jury to acquit Lee of attempting to murder Williams.

26

For all of the foregoing reasons, we conclude the first jury's verdicts finding Lee guilty of counts 4 and 7 were not inconsistent with the second jury's verdicts of acquittal, and even if the guilty verdicts on counts 4 and 7 were inconsistent, Lee's convictions of those counts were supported by sufficient evidence.  Accordingly, we affirm Lee's convictions of counts 4 and 7.

## DISCUSSION

The judgment is affirmed.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.

27